[No. 61428-2-I.   Division One.   April 27, 2009.]

THE STATE OF WASHINGTON, *Appellant*, v. JEFFREY C. MARCUM, *Respondent*.

896

*Janice E. Ellis, Prosecuting Attorney,* and *Mary K. Webber, Deputy,* for appellant.

*Rafael Schwimmer* (of *Schwimmer First, LLP*), for respondent.

¶1 Dwyer, A.C.J. — In this drug possession prosecution, the trial court suppressed physical evidence of four ounces

of marijuana found in Jeffrey Marcum's truck, as well as his admissions that he possessed and had recently used marijuana. The court then dismissed the charges against him. The State appeals. Because the trial court misapplied the law in determining whether an informant who implicated Marcum in drug activity was sufficiently reliable so as to entitle the police to act upon the information that the informant supplied, we hold that the court erred by suppressing the physical evidence based on its conclusion that the police initially detained Marcum without a reasonable suspicion that he possessed marijuana. Because the court also misapplied the law in ruling that Marcum was in custodial detention during a period that he was actually subject to a lawful investigative detention, we further hold that the court erred by suppressing Marcum's admissions based on its conclusion that those statements were unlawfully obtained prior to *Miranda*[1] warnings having been given. Accordingly, we reverse both the suppression orders and the order dismissing the charges against Marcum.

I

¶2 Neither party assigns error to the trial court's findings of fact. Thus, they are verities on appeal. *State v. Broadaway*, 133 Wn.2d 118, 131, 942 P.2d 363 (1997).

¶3 An informant agreed to assist Detective Cyrus O'Bryant in obtaining information about three drug dealers in exchange for Detective O'Bryant not pursuing criminal charges against him based on an unrelated incident.[2] By December 2006, the informant had provided Detective O'Bryant with two potential targets and participated in controlled buys of narcotics from those targets. The information that the informant had provided to Detective O'Bryant during those investigations had been accurate,

---

[1] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

[2] We have largely, but not entirely, adapted the following description from the trial court's unchallenged findings. We also recite additional, highly relevant, uncontroverted testimony that was omitted from the trial court's findings.

although Detective O'Bryant had not yet arrested anyone based on it. By providing one more tip, the informant fulfilled his contract with Detective O'Bryant.

¶4 The informant's final tip resulted in the arrest and prosecution that is the subject of this case. Around December 1, 2006, the informant contacted Detective O'Bryant, telling him that he had known Marcum for some time and had purchased drugs from him before. The informant told Detective O'Bryant Marcum's name and described Marcum, stating his height, weight, and the fact that he was balding. The informant also gave Detective O'Bryant directions to Marcum's home and described Marcum's truck—a green Ford Ranger with a canopy. Detective O'Bryant confirmed through the county assessor's web site that a "Jeffrey Marcum" lived at the address provided by the informant.

¶5 On December 14, 2006, Detective O'Bryant and other police officers devised a plan to catch Marcum dealing marijuana. The plan called for the informant to telephone Marcum and arrange to buy marijuana from him. Once Marcum left his home to make the deal, detectives would detain him while a canine officer used a dog to sniff the outside of his truck for the scent of drugs. Other officers would be ready to provide assistance.

¶6 The operation went as planned. The previous night, the informant had telephoned Marcum and arranged to purchase a quarter pound of marijuana from him. During that conversation, Marcum told the informant that he would have the marijuana ready the following day.

¶7 The next day, after the police officers had taken their positions, Detective O'Bryant directed the informant to telephone Marcum with the message that he was ready to conclude the deal. A few minutes after the informant placed the call to Marcum, the officers observed a green Ford Ranger with a canopy leave Marcum's home.

¶8 At Detective O'Bryant's direction, uniformed officers followed the truck in their patrol car and initiated a traffic

stop. Marcum pulled his truck into a Fred Meyer store parking lot, and several police vehicles pulled up behind him, blocking his truck into a parking spot. Detective Brock Haner (a uniformed officer) then approached the truck. Marcum was in the driver's seat.

¶9 Detective Haner told Marcum that he had been speeding. Marcum had, in fact, been driving under the speed limit, and he told Detective Haner as much. Nevertheless, Detective Haner requested Marcum's driver's license and vehicle registration (which Marcum provided) and returned to his patrol car, where he performed his usual checks on the documents. He then radioed Detective O'Bryant, who in turn radioed the canine officer and informed Detective Haner that that officer was on his way. Detective Haner then exited his patrol car and walked back to Marcum's truck.

¶10 Detective Haner testified that as he returned to Marcum's truck and began speaking with Marcum, he "detected an odor" emanating from the open driver's-side window, which he "was able to identify as marijuana." He then asked Marcum why he "was smelling marijuana in the vehicle." Marcum responded that he did not know why Detective Haner was smelling marijuana. Detective Haner asked if someone might have left marijuana in the truck. Marcum responded that he did not know. Haner then inquired if Marcum smoked marijuana. Marcum responded that he did. Detective Haner then asked when the last time was that Marcum had done so. Marcum responded that he had smoked marijuana that morning. Detective Haner asked him if he was wearing the same clothes he had been wearing when he had smoked marijuana that morning. Marcum responded that he was. Detective Haner asked if perhaps that was why he was smelling marijuana. Marcum responded that it was possible.

¶11 At this point, Detective Haner directed Marcum to exit the truck. According to Detective Haner's testimony, he did so because he "wanted to differentiate the odor, make sure if it was his person, not the car." Detective Haner

testified that he "didn't have a reason to arrest him for the odor, if it was off his person." Thus, Detective Haner "wanted to separate him from what I thought was the odor coming from the car." Detective Haner then had Marcum stand approximately 15 feet from the truck, where he smelled him. He detected no odor of marijuana. Detective Haner then told Marcum, "[T]he jig is up" and "I know it's in the car."

¶12 There was varying testimony as to what occurred next. Detective Haner testified that he then arrested Marcum and searched Marcum's truck, after which the canine officer arrived. However, both Detective O'Bryant and Marcum testified—and the trial court found—that what in fact occurred next was the arrival of the canine officer. The officer arrived and had the dog sniff around Marcum's truck, at which point the dog indicated that drugs were present within. When this occurred, Marcum stated, without prompting, "You've got me. I have drugs," or something similar.

¶13 The police officers then placed Marcum in Detective Haner's patrol car, searched Marcum's truck, and discovered four ounces of marijuana in a small cooler on the front passenger seat. Marcum was then told that he was under arrest, given *Miranda* warnings, and taken to jail. Both en route and while at the jail, Marcum made additional incriminating statements.

¶14 Pursuant to CrR 3.5 and CrR 3.6, Marcum moved to suppress the physical evidence obtained by the police, as well as his incriminating statements. The trial court suppressed both, ruling that (1) "[t]he confidential informant's tip lacked sufficient indicia of reliability to justify the defendant's stop on suspicion that the defendant possessed a controlled substance" and (2) "[b]ecause the defendant was not advised of his Miranda Rights in a timely fashion, his statements to the investigating officers should be suppressed."

¶15 According to the trial court, the police detectives' observations that corroborated the informant's tip—

Marcum's home address, appearance, vehicle make, and the timing of his exit from his home—did nothing to confirm the informant's reliability because those observations merely consisted of "innocuous information." The court also ruled that Marcum was subject to custodial interrogation from the inception of the traffic stop because he "could not possibly have left the scene in his vehicle" and because reasonable persons in his position would not have felt "that they were free to leave."

¶16 Based on these rulings, the court entered the following conclusions of law:

> 1. The physical evidence and the Defendant's statements made before and after he was advised of his *Miranda* Warnings are suppressed because his initial detention was illegal given that the arresting officers lacked sufficient information to justify their *Terry[ v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968),] stop at the Fred Meyer's parking lot.

> 2. In addition, the Defendant's oral and written statements are suppressed because they are the product of non-Mirandized statements given by the defendant while surrounded by police vehicles in the back of a parking lot and in detention tantamount to a custodial interrogation.

Based on these legal conclusions, the court determined that insufficient evidence existed to prosecute Marcum for the charged offense and ordered the charges against him dismissed.

## II

¶17 The State primarily contends on appeal that the trial court misapplied the law when it ruled that the police did not stop Marcum based on a reasonable suspicion that he was engaged in illegal conduct.[3] According to the State, the court erred in two ways: (1) by ruling that the confidential informant's history of providing accurate information to

---

[3] Legal conclusions in rulings on CrR 3.6 motions are reviewed de novo on appeal. *State v. Doughty*, 148 Wn. App. 585, 587, 201 P.3d 342 (2009).

the police, combined with his motivation for telling the truth, was insufficient to provide a basis to believe that his tip was reliable and (2) by examining the police detectives' corroborating observations in isolation from the surrounding circumstances and dismissing those observations as being merely of "innocuous" facts. We agree.

¶18 "[A] stop, although less intrusive than an arrest, is nevertheless a seizure and therefore must be reasonable under the Fourth Amendment and article 1, section 7 of the Washington Constitution." *State v. Kennedy*, 107 Wn.2d 1, 4, 726 P.2d 445 (1986). "If the initial stop was unlawful, the subsequent search and fruits of that search are inadmissible." *Kennedy*, 107 Wn.2d at 4 (citing *Wong Sun v. United States*, 371 U.S. 471, 83 S. Ct. 407, 9 L. Ed. 2d 441 (1963)). Police violate neither the Fourth Amendment nor article I, section 7 by conducting a brief *Terry* investigatory stop if they have "a reasonable and articulable suspicion that the individual [stopped] is involved in criminal activity." *State v. Walker*, 66 Wn. App. 622, 626, 834 P.2d 41 (1992). A reasonable suspicion is the "substantial possibility that criminal conduct has occurred or is about to occur." *Kennedy*, 107 Wn.2d at 6.

¶19 This court recently reiterated that the legal standard for determining whether police suspicion resulting from an informant's tip is sufficiently reasonable to support a *Terry* stop is the "totality of the circumstances" test announced in *Illinois v. Gates*, 462 U.S. 213, 103 S. Ct. 2317, 76 L. Ed. 2d 527 (1983), *not* the two-part reliability inquiry derived from *Aguilar v. Texas*, 378 U.S. 108, 84 S. Ct. 1509, 12 L. Ed. 2d 723 (1964), and *Spinelli v. United States*, 393 U.S. 410, 89 S. Ct. 584, 21 L. Ed. 2d 637 (1969), such as is used to make determinations of probable cause for purposes of obtaining a search warrant. *See State v. Lee*, 147 Wn. App. 912, 916, 199 P.3d 445 (2008) (citing *State v. Randall*, 73 Wn. App. 225, 228-29, 868 P.2d 207 (1994)). Under the totality of the circumstances test, an informant's tip provides reasonable suspicion sufficient to justify an investigatory stop if "it possesses sufficient 'indicia of reli-

ability.' " *State v. Sieler*, 95 Wn.2d 43, 47, 621 P.2d 1272 (1980) (quoting *Adams v. Williams*, 407 U.S. 143, 147, 92 S. Ct. 1921, 32 L. Ed. 2d 612 (1972)).

¶20 The central issue in this case is whether, under the totality of the circumstances test, the informant's tip possessed these "indicia of reliability" and thus justified the officers' suspicions that Marcum possessed marijuana. Under the totality of the circumstances test, a reviewing court determines whether an informant's tip possesses the required "indicia of reliability" by inquiring whether there exist " '[1] . . . circumstances suggesting the informant's reliability, or some corroborative observation which suggests either [2] the presence of criminal activity or [3] that the informer's information was obtained in a reliable fashion.' " *Sieler*, 95 Wn.2d at 47 (some alterations in original) (quoting *State v. Lesnick*, 84 Wn.2d 940, 944, 530 P.2d 243 (1975)). Unlike the analysis in an *Aguilar/Spinelli* inquiry, the so-called "veracity" and "basis of knowledge" "prongs" are not distinct under the totality of the circumstances test; rather, these elements are relevant but are "no longer both essential." *State v. Jackson*, 102 Wn.2d 432, 435-36, 688 P.2d 136 (1984).

¶21 In his briefing, Marcum interprets and applies *Kennedy* in a manner that is directly contradictory to this rule, instead relying on *State v. Hart*, 66 Wn. App. 1, 6-7, 830 P.2d 696 (1992), for the incorrect proposition that the *Aguilar/Spinelli* test applies to *Terry* investigative detentions. Specifically, Marcum argues that the State was required to demonstrate in opposition to his suppression motion "that (1) the informant is reliable and (2) the informant's tip contains enough objective facts to justify the detention of the suspect." Of course, this is a direct paraphrasing of the *Aguilar/Spinelli* test. But as this court observed in *Lee*, *Hart*'s reliance on this formulation improperly ignored that our Supreme Court in *Kennedy* utilized the totality of the circumstances test, not the *Aguilar/Spinelli* test. *See Lee*, 147 Wn. App. at 919; *see also Gates*, 462 U.S. at 233-34 (relying on *Adams* as the basis for the

totality of circumstances test); *Kennedy*, 107 Wn.2d at 8 ("[t]he case at bench falls squarely within the *Adams*" analysis); *Randall*, 73 Wn. App. at 228-29 (decided after *Hart*). Moreover, although the trial court herein did not directly cite *Hart*, it appears to have accepted Marcum's reasoning and adopted his analytical approach in its order. In other words, although the court superficially relied upon *Kennedy*, the analytical approach that it applied in making its rulings was wrongly based on the *Aguilar/Spinelli* factors.

¶22 Contrary to Marcum's contention and the trial court's ruling, the actual state of the law leaves little doubt that the informant's tip, when combined with the corroborating observations of the police detectives, was sufficiently reliable to justify Marcum's temporary detention. Indeed, a straightforward application of *Kennedy* itself mandates this conclusion. In *Kennedy*, there was a tip by a confidential informant that the defendant "regularly purchased marijuana" from a certain residence, and that he drove a car registered to a certain owner. 107 Wn.2d at 3. The informant providing the information had been working with the police for several months, "was reliable," and had provided information leading to the "issuance of a warrant and subsequent conviction." *Kennedy*, 107 Wn.2d at 8. This *alone* "satisfie[d] the 'indicia of reliability' test set forth in *Adams*, *Sieler*, and *Lesnick*." *Kennedy*, 107 Wn.2d at 8. "[*I*]*n addition*," the informant's tip was corroborated by the informant's description of the defendant's car and "neighbors' complaints about the frequent foot traffic" around the residence. *Kennedy*, 107 Wn.2d at 8 (emphasis added).

¶23 The bases that Marcum relies upon in an attempt to restrict the application of *Kennedy* are unavailing. Critically, the trial court's conclusion that "[w]ith regard to the confidential informant's past reliability, Detective O'Bryant . . . provided his conclusory statements that the informant was reliable without providing any definite information as to what kind of information proved the informant reliable in the past," and thus could not provide a

basis to conclude that the informant was reliable, is contrary to established case law. In fact, the confidential informant had previously participated in two controlled drug buys while working for Detective O'Bryant, and Detective O'Bryant specifically testified that the information provided in relation to those buys had been "accurate."

¶24 At least one Supreme Court opinion expressly holds that an informant's track record of this sort sufficiently establishes the informant's reliability for purposes of a *probable cause* determination under the *Aguilar/Spinelli* test, a higher standard than the one at issue here. Indeed, in that case, the police detective's description of the informant's track record was almost identical to Detective O'Bryant's description of the informant's track record in this case. *See State v. Fisher*, 96 Wn.2d 962, 964, 639 P.2d 743 (1982) (" 'The informant is reliable in that he/she has given information regarding drug trafficing [*sic*] and use in the past which has proven to be true and correct [including that the] informant has made two controlled buys to-wit: the informant was searched, given money, observed to enter and return from a residence with controlled substances purchased from within.' " (first alteration in original)); *cf. State v. Woodall*, 100 Wn.2d 74, 75, 76-77, 666 P.2d 364 (1983) (distinguishing *Fisher* because affidavit merely asserted that " 'reliable informant who has proven to be reliable in the past has given information' ").

¶25 Further, the strong implication in both the trial court's suppression order and Marcum's briefing that the confidential informant could not be considered reliable because the information he provided did not lead to arrests or convictions is also incorrect. Indeed, that proposition was expressly and directly rejected in *Fisher*, 96 Wn.2d at 965 (informant's tips that proved accurate but did not lead to arrests or convictions are "enough to enable a neutral magistrate to determine if the informant is credible"). Moreover, the reasonable suspicion required to perform a *Terry* stop is "a much lower standard" than is the probable cause standard established by the informant's tip in *Fisher*.

*Lee*, 147 Wn. App. at 921-22 (citing *United States v. Sokolow*, 490 U.S. 1, 7, 109 S. Ct. 1581, 104 L. Ed. 2d 1 (1989)).[4]

¶26 The trial court's conclusion that the police observations confirming the informant's tip were "innocuous" was likewise unfounded. Indeed, the United States Supreme Court has specifically criticized viewing incriminating police observations, one by one, in a manner divorced from their context as a "divide-and-conquer" approach that is inconsistent with the totality of the circumstances test. *See United States v. Arvizu*, 534 U.S. 266, 274, 122 S. Ct. 744, 151 L. Ed. 2d 740 (2002). Here, as in *Arvizu*, the lower court's "evaluation and rejection" of the officers' observations "in isolation from each other" did "not take into account the 'totality of the circumstances.' " 534 U.S. at 274. Here, as in *Arvizu*, the lower court appeared to believe that each of the officers' observations "was by itself readily susceptible to an innocent explanation [and thus] was entitled to 'no weight.' " 534 U.S. at 274 (quoting *United States v. Arvizu*, 232 F.3d 1241, 1249-51 (9th Cir. 2000)). Here, as in *Arvizu*, this approach "departs sharply from the teachings" of the cases that properly examine the totality of the circumstances to determine whether reasonable suspicion exists. 534 U.S. at 274. Contrary to the trial court's implication in its order, "determination that reasonable suspicion exists . . . need not rule out the possibility of innocent conduct." *Arvizu*, 534 U.S. at 277; *see also Kennedy*, 107 Wn.2d at 6 (explaining that activity consistent with both criminal and noncriminal activity may justify a brief detention). Rather, "the determination of reasonable suspicion must be based on commonsense judgment and inferences about human behavior." *Illinois v. Wardlow*, 528 U.S. 119, 125, 120 S. Ct.

---

[4] Marcum's contention that this case is distinguishable from *Lee* because it involves a tip from an informant from the criminal subculture as opposed to the citizen informant at issue in *Lee* is likewise meritless. This is so, most obviously, because *Kennedy* itself—upon which *Lee* relies—involved a confidential informant strikingly similar to the informant herein.

673, 145 L. Ed. 2d 570 (2000).[5] "In allowing [investigative] detentions, *Terry* accepts the risk that officers may stop innocent people." *Wardlow*, 528 U.S. at 126.

¶27 The details provided to Detective O'Bryant by the confidential informant, when viewed in context, were not "innocuous." Indeed, they directly corroborated everything that the informant had previously told Detective O'Bryant. Specifically, a truck registered to Marcum (which the informant had told the police about) left a home owned by Marcum (which the informant had directed the police to) minutes after the informant placed an order with Marcum for the purchase of marijuana. It frankly strains credulity to suppose that, under these circumstances, none of the information provided by the informant could lead a trained police observer to form a reasonable suspicion that Marcum possessed marijuana when he left his home.

¶28 Finally, our Supreme Court has held, in circumstances of even greater uncertainty than are present here, that a confidential informant's motive for providing the police with truthful information—the desire to avoid criminal consequences—is sufficient to support a finding that the informant is reliable. *See State v. Bean*, 89 Wn.2d 467, 471, 572 P.2d 1102 (1978) ("[b]ecause of the strong motive [the informant] had to be accurate in the information he provided the officers [he] qualifies as a reliable informant" where "previously furnished details concerning" the defendant had been verified).[6] Here, as in *Bean*, the informant's motive supported the conclusion that he was reliable.

---

[5] *Arvizu*'s language is, if anything, even more cognizant than is *Kennedy* of the idea that trained police observers may form reasonable suspicion based on circumstances that ordinary observers would not necessarily construe as potentially criminal. That is, an officer may "draw on [his or her] own experience and specialized training to make inferences from and deductions about cumulative information available to [him or her] that 'might well elude an untrained person.'" *Arvizu*, 534 U.S. at 273 (quoting *United States v. Cortez*, 449 U.S. 411, 418, 101 S. Ct. 690, 66 L. Ed. 2d 621 (1981)). Because article I, section 7 jurisprudence is parallel to Fourth Amendment jurisprudence in the *Terry* stop context, other than with regard to the so-called "pretext stop," *see State v. Ladson*, 138 Wn.2d 343, 358, 979 P.2d 833 (1999), this clarification is equally applicable here.

[6] Again, this holding addressed the more stringent probable cause standard.

¶29 The trial court's conclusion that the confidential informant's tip was insufficiently reliable to justify the detention of Marcum was made in error.

III

¶30 The State next contends that the trial court erred by ruling that the detention of Marcum was from its inception a custodial arrest and, thus, that Detective Haner violated Marcum's Fifth Amendment rights by asking him questions before giving him *Miranda* warnings.[7] We agree. The trial court erred by ruling that Detective Haner was required to give Marcum *Miranda* warnings at the outset of their interaction.

¶31 Initially, as the trial court correctly observed in its suppression order, Detective Haner's untruthfulness in informing Marcum that he had been stopped for speeding did not render Marcum's detention unlawful. The reasonable suspicion that Marcum possessed marijuana provided the justification for the stop. This being the case, the detection of marijuana odor by Detective Haner, the investigation of Marcum's truck by the canine officer, and the search of the truck were unlawful only if (1) the trial court's ruling concerning the timing of custodial arrest was correct *and* (2) probable cause to arrest Marcum was created only through statements made by Marcum that should have been, but were not, preceded by *Miranda* warnings. In fact, neither of these things is true.

¶32 Contrary to the trial court's ruling, the fact that numerous police vehicles surrounded Marcum in the grocery store parking lot did not convert the investigatory detention of Marcum into a custodial arrest. By definition, someone subject to a *Terry* investigative detention is not "free to leave." *Kennedy*, 107 Wn.2d at 4 ("a stop, although

---

[7] An appellate court reviewing a CrR 3.5 suppression order "must determine de novo whether the trial court 'derived proper conclusions of law' from its findings of fact." *State v. Solomon*, 114 Wn. App. 781, 789, 60 P.3d 1215 (2002) (quoting *State v. Armenta*, 134 Wn.2d 1, 9, 948 P.2d 1280 (1997)).

less intrusive than an arrest, is nevertheless a seizure"). On the contrary, a person subject to a vehicular *Terry* stop "is seized . . . 'from the moment [a car stopped by the police comes] to a halt.' " *Arizona v. Johnson*, 555 U.S. ___, 129 S. Ct. 781, 787, 172 L. Ed. 2d 694 (2009) (second alteration in original) (quoting *Brendlin v. California*, 551 U.S. 249, 263, 127 S. Ct. 2400, 168 L. Ed. 2d 132 (2007)). Provided the stop is justified by reasonable suspicion and does not exceed its allowable purpose, the presence of numerous officers does not convert it into a custodial arrest. The trial court's observation that "what occurred after Mr. Marcum was stopped for the traffic stop was not consistent with the routine traffic stop" is beside the point. Marcum was not stopped for a traffic violation, nor was the stop "routine," in the sense that it was the result of a patrol officer investigating potentially unlawful conduct observed by happenstance. The purpose of the stop was to investigate whether Marcum was engaged in dealing drugs.

¶33 During such a seizure, suspects need not "feel that they were free to leave." On the contrary, it is now well established that "[f]or the duration of a traffic stop . . . a police officer effectively seizes 'everyone in the vehicle.' " *Johnson*, 129 S. Ct. at 784 (quoting *Brendlin*, 551 U.S. at 255).[8] Marcum was not free to leave. But that does not convert his investigatory detention into a custodial arrest for purposes of the Fifth Amendment. Rather, a "detaining officer may ask a moderate number of questions during a *Terry* stop to determine the identity of the suspect and *to confirm or dispel the officer's suspicions* without rendering the suspect 'in custody' for the purposes of *Miranda*." *State v. Heritage*, 152 Wn.2d 210, 218, 95 P.3d 345 (2004) (emphasis added). Such questioning is precisely what occurred here.

---

[8] Although our Supreme Court has previously held that, under both the Fourth Amendment and article I, section 7, a passenger is not seized when a vehicle is stopped by the police, *State v. Mendez*, 137 Wn.2d 208, 221-22, 970 P.2d 722 (1999), it is apparent that this holding has been superseded with respect to the Fourth Amendment by *Brendlin* and will be without practical effect for state constitutional purposes given *Brendlin*'s more protective Fourth Amendment analysis of the question.

¶34 During that questioning, Marcum admitted that he had smoked marijuana that day. To the extent that this statement was incriminatory, its suppression was not required. After the canine officer's dog alerted to the presence of marijuana, Marcum blurted out—not in response to any question—that he had drugs. Marcum was not yet in custody at this time. The suppression of this statement was improper as well. Marcum was *then* placed under arrest. At that point, *Miranda* warnings were required and any statements made without the required warnings having been given would have been properly subject to suppression. But warnings *were* given. Thus, to the extent the trial court's suppression ruling covered statements made after Marcum's arrest, it was, again, improperly ordered.

¶35 Because Marcum was detained based on the suspicion that he possessed marijuana, it would have been reasonable for detective Haner to simply await the arrival of the canine officer to either dispel that suspicion or, if the officer's dog alerted to the presence of contraband in the truck, to establish probable cause to arrest Marcum and search his vehicle. This being the case, Detective Haner violated none of Marcum's constitutional rights by approaching Marcum's vehicle to investigate (consistent with the purpose of the detention) whether Marcum was, indeed, engaged in dealing drugs.

¶36 Which leads to the larger point: given the highly incriminating nature of the physical evidence discovered by the police, the suppression of Marcum's incriminating statements is primarily significant only if those statements are what led the police to discover the physical evidence and, thus, if the exclusion of the statements would also require exclusion of the physical evidence as "fruit of the poisonous tree."

¶37 But Marcum's statements are not what created probable cause for Detective Haner to arrest Marcum and search his truck. Rather, immediately upon returning to Marcum's truck after confirming Marcum's identity, Detective Haner smelled marijuana. At this point, Marcum had

made no incriminating statements whatsoever. However, "[a]ny police officer having probable cause to believe that a person has committed or is committing a misdemeanor or gross misdemeanor . . . involving the use or possession of cannabis . . . shall have the authority to arrest the person." RCW 10.31.100. Marcum was the only person in his truck. The odor of marijuana emanating from the truck could not be associated with anyone other than Marcum. As such, the odor created sufficient individualized probable cause for Detective Haner to believe that Marcum possessed marijuana for Detective Haner to arrest Marcum and search his truck incident to that arrest. *Cf. State v. Grande*, 164 Wn.2d 135, 145, 187 P.3d 248 (2008). Nothing that followed Detective Haner's sensing the odor of marijuana in any way served to negate the establishment of probable cause or made the discovery of the marijuana in the truck dependent on incriminating statements by Marcum.

¶38 Reversed.

AGID and ELLINGTON, JJ., concur.