# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

FILED
COURT OF APPEALS DIV I
STATE OF WASHINGTON
2018 DEC -3 AM 10: 24

STATE OF WASHINGTON, )
                      )    DIVISION ONE
          Respondent, )
                      )    No. 76511-6-I
       v.              )
                      )    UNPUBLISHED OPINION
PAMELA E. BELL, )
                      )
          Petitioner. )    FILED: December 3, 2018
                      )

DWYER, J. — Following a traffic stop, Pamela Bell was charged with and convicted of driving under the influence. On discretionary review, Bell avers that the trial court erred by denying her motion to suppress evidence gathered as a result of the stop, claiming that substantial evidence did not support the trial court's finding that her driving was abnormal, thus justifying the officers' decision to initiate an investigatory detention. Finding no error, we affirm.

I

On February 13, 2013, two officers of the Port of Seattle Police Department responded to a call concerning an intoxicated female driver "attempting to leave" the toll plaza outside the parking garage at SeaTac International Airport. The identity of the caller was unknown. The toll plaza consists of between 12 and 15 one-way lanes of traffic between the garage's exit and a series of toll booths. When Officer Ryan Leavengood and his police training officer arrived at the toll plaza, traffic within the plaza was moderate, with

between 15 and 20 vehicles either driving through the area or queuing at the toll booths.

Upon the officers' arrival, a toll booth employee gestured to them and pointed to a "small coupe style vehicle that was parked inside the toll plaza." The officers could not drive to the vehicle because their patrol car was parked on the other side of the one-way toll gates. The coupe style vehicle, which was operated by Bell, was near the southeast side of the toll plaza and was not in any lane of traffic. The officers, unable to tell if the vehicle's engine was running, walked toward the vehicle to speak with its driver. Officer Leavengood sought "to ensure that [Bell] was in fact not impaired before she took off through the toll plaza."

As Officer Leavengood approached, Bell's vehicle moved from the southeast side of the plaza and across several lanes into exit lane 8 or 9. Officer Leavengood told Bell to stop, and she did. A second patrol car, driven by Officer Raymond Blackwell, arrived at the scene from the parking garage and parked behind Bell's vehicle.

Officer Leavengood spoke with Bell and noticed signs that she was intoxicated. Bell agreed to perform voluntary field sobriety tests. After a poor performance on each test, she was placed under arrest.

The State charged Bell with driving under the influence (DUI) pursuant to RCW 46.61.502. Before trial, Bell moved to suppress evidence gathered from that which she alleged to be an unlawful stop. The district court held a hearing on this motion at which Officers Leavengood and Blackwell testified. Officer

Leavengood testified that he learned, from dispatch, that there was "an intoxicated driver attempting to leave the toll plaza." Blackwell testified that the officers were advised that an unnamed "toll plaza individual" had reported an intoxicated female driver in a vehicle with Alaska license plates. Both officers testified to their training and experience in identifying impaired drivers: Leavengood estimated that he had made between 50 and 60 investigations for DUI during his career, while Blackwell stated that he had made over 200 such investigations. Both officers testified that a driver's failure to obey lane markings is one indicator that the driver may be impaired.

The trial court issued a written order denying Bell's motion to suppress. In its order, the trial court noted that the officers acted in response to both the telephone call from the unidentified informant and the tip from the toll plaza employee who "flagged down" Leavengood and "pointed to the defendant's coupe style vehicle," and further, that "[w]hen Officer Leavengood and Officer Blackwell arrived, they observed the identified vehicle sitting inside the toll plaza area, but not moving. This is not normal behavior for vehicles approaching the toll plaza." The trial court concluded that, given that the officers saw Bell's vehicle "stopped in the toll plaza entrance in a location that is not designed or normally used for such stops," the officers had "sufficient corroboration of the toll worker's identification to justify an initial contact." Thus, the trial court denied Bell's motion.

Following a jury trial, Bell was found guilty of DUI. Bell, assigning error to the denial of her motion to suppress evidence, appealed the conviction to the

superior court, which affirmed. We subsequently granted Bell's motion for discretionary review.

II

Bell first assigns error to the trial court's factual finding that the initial, stationary position of her vehicle on the side of the toll plaza was "not normal behavior for vehicles approaching the toll plaza." This is erroneous, she asserts, because substantial evidence did not support the finding. We disagree.

In reviewing the denial of a motion to suppress, we determine whether the trial court's findings of fact are supported by substantial evidence. State v. Garvin, 166 Wn.2d 242, 249, 207 P.3d 1266 (2009). Evidence is substantial when it is "sufficient . . . to persuade a fair-minded person of the truth of the stated premise." State v. Thetford, 109 Wn.2d 392, 396, 745 P.2d 496 (1987). Conclusions of law from an order pertaining to the suppression of evidence are reviewed de novo. State v. Duncan, 146 Wn.2d 166, 171, 43 P.3d 513 (2002).

The testimony offered at the pretrial hearing on Bell's motion to suppress gave the trial court a sufficient basis to conclude that parking at the edge of the toll plaza was not normal driving behavior. Officer Leavengood stated that the area in which Bell's car was parked was "outside of the garages" where other cars would park. Officers Leavengood and Blackwell both testified that the portion of the plaza wherein Bell was located did not contain any parking area, but, rather, contained between 12 and 15 lanes dedicated to through traffic. Officer Leavengood also testified that, at the time he arrived, between 15 and 20 cars were either "in line waiting to get out" of the plaza or "exiting the parking

structure on their way to the toll plaza," making Bell's stationary vehicle stand out.

Based on these observations, a fair-minded person could determine that the position of Bell's parked car, the only parked car in this location, was unusual.

Bell contends otherwise, presenting the narrative that she had momentarily stopped on a "shoulder" of the toll plaza. She offers that vehicles may often be found stopped on the shoulder of a roadway for innocent reasons, that the officers had likely seen vehicles in such positions before, and that "it is not difficult to imagine circumstances that would involve [this shoulder area's] regular use [for parked vehicles]." She also avers that Officer Leavengood did not have the "special training transforming the observation into suspicious behavior," and that Leavengood may not have been experienced enough in his position with the Port of Seattle Police to ascertain what was or was not unusual behavior for vehicles in this toll plaza.

Bell, however, does not point to any evidence beyond the realm of the hypothetical indicating that drivers regularly stopped on the side of the toll plaza before exiting. Nor does she present any authority indicating that a police officer cannot make determinations of driver and vehicle behavior on a roadway unless they have reached some minimum threshold level of familiarity with that particular road surface. Even if Officer Leavengood had not previously had the opportunity to see typical traffic flow in the toll plaza, he gained that opportunity when he arrived on the scene and saw various vehicles moving through in marked lanes while Bell failed to do so. Bell's claim about Leavengood's lack of

special training is plainly contradicted by the record, which indicates that he had completed multiple police training courses on identifying impaired drivers, and that he had previously apprehended such drivers. Finally, officers have the discretion to draw inferences from conduct even where that conduct may have an innocent explanation. State v. Samsel, 39 Wn. App. 564, 570-71, 694 P.2d 670 (1985). The trial court's finding of fact is supported by substantial evidence.

III

Next, Bell contends that the trial court erred by ruling that the officers had a reasonable, articulable suspicion under the totality of the circumstances to justify the initial detention. This is so, Bell asserts, because the informant's tip did not possess the requisite indicia of reliability to justify the officers' reliance thereon, and because her conduct did not pose a danger to the public. Thus, Bell asserts, the Terry[1] stop was not justified. We disagree.

Warrantless searches are presumed to be unreasonable and the State bears the burden of showing that a seizure falls within an exception to the warrant requirement. State v. Z.U.E., 183 Wn.2d 610, 617, 352 P.3d 796 (2015). The authority for a warrantless investigative detention is derived from Terry v. Ohio, 392 U.S. 1. State v. Kennedy, 107 Wn.2d 1, 5-6, 726 P.2d 445 (1986). A Terry stop is justified if an officer has a reasonable suspicion that the person stopped has been or is about to be involved in a crime. State v. Acrey, 148 Wn.2d 738, 747, 64 P.3d 594 (2003). Under article I, section 7 of the Washington Constitution, the facts available to an officer at the time of an

_____

[1] Terry v. Ohio, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968).

investigative detention must also connect the suspect to the particular crime that the officer is investigating. Z.U.E., 183 Wn.2d at 618.

The reasonableness of an officer's suspicion is determined by the totality of the circumstances known to the officer at the inception of the stop. State v. Lee, 147 Wn. App. 912, 917, 199 P.3d 445 (2008). This determination takes into account an officer's training and experience and "'commonsense judgments and inferences about human behavior.'" Lee, 147 Wn. App. at 917 (quoting Illinois v. Wardlow, 528 U.S. 119, 125, 120 S. Ct. 673, 145 L. Ed. 2d 570 (2000)). "[C]ircumstances which may appear innocuous to the average person may appear incriminating to a police officer in light of past experience. The officer is not required to ignore that experience." Samsel, 39 Wn. App. at 570-71; accord United States v. Cortez, 449 U.S. 411, 418, 101 S. Ct. 690, 66 L. Ed. 2d 621 (1981). Pursuant to both the Fourth Amendment to the United States Constitution and article I, section 7 of the Washington Constitution, reasonable suspicion may justify a detention even when a suspect is subsequently found to be innocent of any misconduct.

> It is well established that, "[i]n allowing [investigative] detentions, Terry accepts the risk that officers may stop innocent people." Wardlow, 528 U.S. at 126. However, despite this risk, "[t]he courts have repeatedly encouraged law enforcement officers to investigate suspicious situations." State v. Mercer, 45 Wn. App. 769, 775, 727 P.2d 676 (1986).

Lee, 147 Wn. App. at 918 (some alterations in original). Thus, when an individual's activity is consistent with criminal activity, even if it might also be consistent with noncriminal activity, a detention may be justified. Kennedy, 107 Wn.2d at 6; accord United States v. Arvizu, 534 U.S. 266, 274, 122 S. Ct. 744,

151 L. Ed. 2d 740 (2002). We have previously rejected the notion that incriminating police observations must be analyzed individually and severed from their context as being inconsistent with the totality of the circumstances analytical mandate. State v. Marcum, 149 Wn. App. 894, 907, 205 P.3d 969 (2009) (citing Arvizu, 534 U.S. at 274).

Our Supreme Court recently reiterated that the proper standard for determining whether police suspicion resulting from an informant's tip is sufficiently reasonable to support a Terry stop is the totality of the circumstances test. Z.U.E., 183 Wn.2d at 624. This test is distinct from the two-part reliability inquiry derived from Aguilar v. Texas, 378 U.S. 108, 84 S. Ct. 1509, 12 L. Ed. 2d 723 (1964), and Spinelli v. United States, 393 U.S. 410, 89 S. Ct. 584, 21 L. Ed. 2d 637 (1969), that is used to make determinations of probable cause for purposes of obtaining a search warrant.[2] Z.U.E., 183 Wn.2d at 624. Under a totality of the circumstances analysis, an informant's tip supports reasonable suspicion sufficient to justify an investigatory detention if it, in the context of all the available facts, "possesses sufficient 'indicia of reliability.'" State v. Sieler, 95 Wn.2d 43, 47, 621 P.2d 1272 (1980) (quoting Adams v. Williams, 407 U.S. 143, 147, 92 S. Ct. 1921, 32 L. Ed. 2d 612 (1972)).

---

[2] The source's veracity and the basis of the informant's knowledge, the two "prongs" of the Aguilar-Spinelli test, are not treated as necessary elements that must be established under a "totality of the circumstances" inquiry. Z.U.E., 183 Wn.2d at 620. Bell appears to rely on the Aguilar-Spinelli two-prong test to assert that a source's veracity must be independently proven, even in a totality of the circumstances analysis. Her contention is based upon a misconstruction of the Supreme Court's holding in Z.U.E., which eschewed Aguilar-Spinelli's two-prong test in favor of the totality of the circumstances inquiry as applied in Lee and Marcum. Z.U.E., 183 Wn.2d at 620-21.

We determine whether an informant's tip possesses the required "indicia of reliability" by inquiring whether there exist (1) circumstances establishing the informant's reliability, or (2) some corroborative observation, usually by the officers, that shows either (a) the presence of criminal activity or (b) that the informer's information was obtained in a reliable fashion. Z.U.E., 183 Wn.2d at 618 (citing Sieler, 95 Wn.2d at 47; State v. Lesnick, 84 Wn.2d 940, 944, 530 P.2d 243 (1975)). "These corroborative observations do not need to be of particularly blatant criminal activity, but they must corroborate more than just innocuous facts." Z.U.E., 183 Wn.2d at 618.

The danger presented to the public by the crime alleged is also part of the totality of the circumstances analysis. Courts have recognized that ongoing emergencies support broader law enforcement discretion than does suspicion of unlawful, but not imminently dangerous, activities. "An officer may do far more if the suspected misconduct endangers life or personal safety than if it does not." State v. McCord, 19 Wn. App. 250, 253, 576 P.2d 892 (1978). "[T]he seriousness of the criminal activity reported by an informant can affect the reasonableness calculus which determines whether an investigatory detention is permissible." Sieler, 95 Wn.2d at 50 (citing Lesnick, 84 Wn.2d at 944-45).

Accordingly, "when a tip involves a serious crime or potential danger, less reliability may be required for a stop than is required in other circumstances." Z.U.E., 183 Wn.2d at 623. Z.U.E. specifically recognized impaired driving as an offense inviting such potential danger, based on the reasoning of Navarette v. California, 572 U.S. 393, 134 S. Ct. 1683, 188 L. Ed. 2d 680 (2014). In

Navarette, the informant was a 911 caller who reported that the suspect had run her off the road with his vehicle. 572 U.S. at 395. In response, a police officer followed the suspect's vehicle for several miles but did not observe any indication of impaired driving. Nevertheless, the Court held that the special danger presented by intoxicated drivers justified the suspect's investigative detention "because allowing a drunk driver a second chance for dangerous conduct could have disastrous consequences." Navarette, 572 U.S. at 404. Thus, the special danger posed by an impaired driver on a public roadway may be a significant factor in the totality of the circumstances informing an officer's reasonable, articulable suspicion.

The central issue herein is whether, under the totality of the circumstances, the anonymous informant's tips possessed the necessary "indicia of reliability" to justify Officer Leavengood's suspicion that Bell was driving under the influence of intoxicants. In fact, Officer Leavengood received two tips: first, information in the telephone call relayed through the Port of Seattle's police dispatch, and second, the gesture toward Bell's car by a toll booth employee on the scene. Bell avers that neither possessed the requisite indicia of reliability to justify the officers' subsequent actions. Bell emphasizes that the officers did not ascertain the identity of the individual who placed the call prior to making contact with Bell, that the officers had no indication that the tip was based on an eyewitness observation, and that no other details or facts supported the caller's report of drunk driving.

- 10 -

Neither officer spoke directly with the informant who placed the telephone call; as a matter of routine, both received the tip via the dispatcher. The record, however, indicates that the officers knew from the dispatch that the caller was a "toll plaza individual."[3] In the immediacy of the situation, with the possibility of an intoxicated driver about to enter a public highway, the police dispatcher conveyed the necessary information given by the informant to the officers for their response. Police are not required to distrust ordinary citizens who report crimes, and "'[c]ourts are not required to sever the relationships that citizens and local police forces have forged to protect their communities from crime.'" Lee, 147 Wn. App. at 919 (alteration in original) (quoting United States v. Christmas, 222 F.3d 141, 145 (4th Cir. 2000)).

Further, the observations relayed by the call implied that the informant was, in fact, an eyewitness to Bell's driving, as the informant identified Bell's gender and her car's Alaska license plates, while also communicating that Bell was "attempting," impliedly without success, to exit the toll plaza even as other traffic moved through the plaza normally.

Bell does not contend that the second tip was not reliable. It is not established in the record that the gesture was made by the same person who placed the telephone call, but it is plain that the second tip was based on eyewitness observation. Indeed, only two possibilities exist: either the toll booth employee who gestured toward Bell's vehicle was the *same* person who made

---

[3] Bell contends that the first informant called the police on a non-emergency line, with the implication that this rendered the informant less accountable than would a call to a 911 system. However, her citation to the record does not support this assertion, nor does any evidence elsewhere in the record indicate that a non-emergency line was used in lieu of 911.

the initial report *or* that employee was the *second* person to request police attention to Bell's driving. In either circumstance, the credibility of the initial report is enhanced.

Importantly, the employee who gestured at Bell's vehicle was a person known to the police—even if the officers did not know that person's name, the person was present before them and (as an employee at the toll booth) was easily identifiable. This also enhances the credibility of the report.

In disputing the reliability of the informants, Bell overlooks the fact that an informant's reliability need only be independently shown in the absence of a corroborating observation. Z.U.E., 183 Wn.2d at 618-19. The informant's tips herein did not lack corroboration. Officer Leavengood saw Bell's vehicle parked outside any lane of a multi-lane roadway, and not in an area designated for parking, while other vehicles were moving unimpeded through the toll plaza. Then, Leavengood saw Bell move from the side of this roadway into a lane. Both officers testified that there were between 12 and 15 lanes in the toll plaza, and Officer Leavengood stated that Bell was parked on the edge "past lane 12 or 15" and then moved into lane 8 or 9. Bell would have had to cross several lanes to get to this position, and Officer Leavengood would have seen her perform this maneuver. Based on his experience dealing with impaired drivers and his knowledge that such drivers often experience difficulty respecting marked lanes of traffic, the record shows that he had before him sufficient facts to corroborate the tip. Under the totality of the circumstances, the informant's tips possessed sufficient indicia of reliability to justify Leavengood's reliance thereon.

Bell lastly contends that her conduct presented no immediate danger to the public because her vehicle was in a secure, gated area and the exit was blocked by Officer Leavengood's patrol car. For several reasons, this in no way eliminates the danger posed to the public. First, Bell moved her vehicle on to a roadway with moving traffic. The other vehicles that the officers observed moving through the plaza at that time were all endangered by the presence of an impaired driver. Second, the toll plaza had between 12 and 15 lanes, and the fact that one lane was blocked by a patrol car would not have precluded Bell from using any of the other lanes to exit and access a more heavily trafficked public highway. The record shows that the police were aware of motorists who had driven directly through the toll gates and broken the swinging arms of the gates. Thus, it cannot be said that her impaired driving posed significantly less danger than is typical of other forms of the same offense.

The officers who detained Bell acted lawfully. The trial court did not err in denying the motion to suppress.

Affirmed.

We concur: