IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON,<br><br>            Respondent,<br><br>          v.<br><br>CRISTIAN MAGAÑA-AREVALO,<br><br>            Appellant. | No. 84259-5-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION |

CHUNG, J. — Cristian Magaña Arevalo was convicted of one count of murder in the first degree with a firearm enhancement. He received a sentence of 320 months for the murder and 60 months for the firearm enhancement. On appeal, Magaña Arevalo challenges the admission of his statements to police obtained without Miranda[1] warnings, claiming they were made pursuant to a custodial interrogation and were not voluntary. He also challenges the use of Zoom videoconferencing to conduct voir dire and the court's denial of an exceptional downward sentence because he was 21 years old at the time of the murder. Further, in his statement of additional grounds for review (SAG), Magaña Arevalo raises claims of prosecutorial misconduct, ineffective assistance of counsel, improper admission of hearsay evidence, and insufficiency of the evidence.

---

[1] Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

As for Magaña Arevalo's statements to police, we hold that at the time they were made, a reasonable person in his position would believe they were in custody to a degree associated with formal arrest. However, the statements he made to detectives were voluntary and admissible for the purpose of impeachment. Further, any error in admitting the statements as substantive evidence was harmless, as the untainted evidence was overwhelming and establishes beyond a reasonable doubt that the outcome would have been the same without the admission of Magaña Arevalo's statements. Moreover, none of Magaña Arevalo's other challenges to his judgment and sentence require reversal.

We affirm Magaña Arevalo's conviction and sentence.

FACTS

Around 6:30 p.m. on November 30, 2018, residents of an apartment complex in Renton, Washington, heard gunshots and rushed outside to see what had happened. There, they found Jason Hobbs, who had been shot multiple times and subsequently died at the scene. A neighbor's surveillance camera recorded the incident. The video shows a dark sports utility vehicle (SUV) with shiny tire rims driving through the parking lot at 6:29 p.m. Hobbs followed the vehicle in his car. Shortly after, Hobbs, who was wearing a light-colored hooded jacket or sweatshirt and dark vest, and another man in a two-toned jacket and dark pants appear on the video and are involved in a physical confrontation. Hobbs retreats. The man in the two-toned jacket then shoots him at close range, and Hobbs falls. The man

2

starts to walk away but returns and shoots Hobbs several more times before running away.

Officers from the Renton Police Department (RPD) responded to the scene and began investigating. During the investigation, Cristian Magaña Arevalo arose as a person of interest. The State subsequently charged Magaña Arevalo with one count of murder in the first degree with a firearm enhancement.

A jury convicted Magaña Arevalo as charged. Because he was 21 years old at the time of the murder, Magaña Arevalo requested the court impose an exceptional downward sentence based on his youth as a mitigating factor. The trial court declined Magaña Arevalo's request and imposed the high end of the standard range, 320 months of incarceration, as well as 60 months for the firearm enhancement to be served consecutive to the base sentence.

Magaña Arevalo appeals.

DISCUSSION

Magaña Arevalo challenges admission of his statements to police obtained without <u>Miranda</u> warnings, the trial court's use of Zoom[2] to conduct virtual voir dire, and the court's denial of an exceptional downward sentence. In his statement of additional grounds for review (SAG), Magaña Arevalo also raises other issues including prosecutorial misconduct, ineffective assistance of counsel, admission of hearsay evidence, and sufficiency of the evidence.

---

[2] Zoom is a cloud-based videoconferencing software platform.

I.      Admission of Magaña Arevalo's Statements to Police

Magaña Arevalo made statements to the police during two separate interviews on December 1 and during another interview on December 3. On appeal, Magaña Arevalo challenges the first two statements as made during custodial interrogation without <u>Miranda</u> warnings and as not voluntary. He does not argue that the December 3 statement was inadmissible on those grounds, but that it was inadmissible as fruit of the poisonous tree based on the December 1 interviews.

Early in the morning on December 1, 2018, RPD executed a search warrant for Magaña Arevalo's girlfriend's apartment, where he was known to reside, as well as for his vehicle and a DNA buccal swab. Because Magaña Arevalo was a suspect in a violent homicide, a special weapons and tactics (SWAT) team assisted with serving the search warrant.

By 6 a.m., at least 25 police officers, including the SWAT team, amassed outside of the apartment where 21-year-old Magaña Arevalo, his pregnant girlfriend, and their young son slept.[3] The family awoke to a megaphone calling Magaña Arevalo to come out and warning that the police would come into the residence if he did not comply. When he went outside, Magaña Arevalo saw what

---

[3] Detective Edwards testified that a SWAT team is generally 20 to 30 officers, depending on who arrives on scene. He acknowledged that at least 10 members of the SWAT team would have been onsite for execution of the search warrants. Edwards also explained that 16 or 17 officers were on scene prior to the SWAT team.

he called "the SWAT truck"[4] and "a bunch" of police officers with weapons. An armed uniformed officer used zip-ties to secure Magaña Arevalo's hands behind his back. His girlfriend and son were taken a short distance away in the parking lot. Magaña Arevalo stood next to the SWAT truck for a few minutes before being placed in the back of a police car. Still cuffed behind his back, Magaña Arevalo spent a few minutes sitting in the police car before an officer said they were taking him to the nearby QFC (Quality Food Center) parking lot to speak with detectives.

Magaña Arevalo's family remained in the parking lot near the apartment while the uniformed officer drove him to the police staging area in the QFC parking lot about two blocks from the apartment. When he arrived in the QFC parking lot, Magaña Arevalo saw approximately five police cars, two or three police vans, and five law enforcement officers.

RPD Detective Christopher Edwards met Magaña Arevalo as he was removed from the patrol car in the QFC parking lot. Edwards immediately removed the zip-ties from Magaña Arevalo's hands. Magaña Arevalo asked about his family and if he could speak with them but was not allowed to see them per RPD procedure.

Edwards inquired whether Magaña Arevalo would be willing to speak with him, and Magaña Arevalo agreed. Edwards gave Magaña Arevalo the choice of remaining in the QFC parking lot or going to the police station, where they would

---

[4] Edwards identified the vehicle as a "BearCat" and described it as an armored vehicle that looks "like a full-sized armored car for a bank" and "olive drab or black but it's emblazoned with Police and lights."

5

have privacy, warmth, a bathroom, and other amenities. Magaña Arevalo opted to stay on location to be near his family.

At 6:47 a.m., Edwards began the interview. He conducted the interview in his work truck due to the "extremely cold" weather, with himself and Magaña Arevalo in the back seat and RPD Detective Jason Renggli in the driver's seat. The truck was unmarked and did not have a police divider or cage. Edwards did not make a point of locking the truck doors or telling Magaña Arevalo the doors were locked. Both detectives were armed but did not display their weapons. There were armed officers "loitering in the parking lot and around the other cars," but none of them were guarding the exterior of the truck or standing outside the truck's door.

Neither Edwards nor Renggli advised Magaña Arevalo of his Miranda rights. Magaña Arevalo expressed willingness to talk and consented to the conversation being recorded. Edwards told Magaña Arevalo, "[Y]ou're not under arrest. We just wanted to talk to you about an incident that we're gonna explain to you. You can leave anytime." Edwards then inquired, "[Y]ou have any idea why we're here or why we would be here?" Magaña Arevalo responded that he had seen on Facebook that someone had been shot. Magaña Arevalo explained that his friends who knew the victim asked if he knew what happened, but Magaña Arevalo told them he had been with his family all day. Magaña Arevalo told Edwards that he had looked at the RPD website and learned that "some dude" named Jason had

6

been shot. Magaña Arevalo admitted that he had known the victim "for a long time," but did not associate "with those people" because he had his family.

Edwards asked what Magaña Arevalo had done that day. Magaña Arevalo replied that he and his girlfriend had taken their son out to eat and to the Nike outlet store to buy shoes. His girlfriend drove them in her white Acura. Edwards inquired whether Magaña Arevalo owned a car. Magaña Arevalo said he owned a Honda. When pressed about whether he owned any other cars, Magaña Arevalo explained that he owned a 2002 blue Chevrolet Tahoe but he "d[idn't] really drive the truck too much." At that time, the truck was in the apartment complex.

After discussing vehicles, Edwards returned to the topic of when Magaña Arevalo had first heard about the incident. Magaña Arevalo responded that his friend had called while he was out with his family and asked if Magaña Arevalo knew what happened. Magaña Arevalo told Edwards, "I don't even talk to my brother, 'cause they said that they brought up my brother and stuff. I don't even talk to my brother like that. I don't be around my brother like that." Magaña Arevalo explained that he did not like associating "with people like that" because he had a pregnant girlfriend and child. Magaña Arevalo had last seen his brother, Jose, two days before.

Edwards asked Magaña Arevalo for his phone number. Magaña Arevalo responded that he did not have a phone number, he used his girlfriend's phone. Magaña Arevalo explained that he had recently lost his phone and was going to

7

have to get another. Magaña Arevalo provided Edwards with his girlfriend's phone number and the phone number for his missing cell phone.

Edwards paused the questions to confirm to Magaña Arevalo that Hobbs had been killed. Magaña Arevalo said, "I didn't, myself, want to be involved in that—all that situation. 'Cause I know that there's—it's—it's about, um, a few people that shot at my uncle's house, before." Magaña Arevalo noted, "That's the reason why I stay away from everybody, you know what I mean?"

The questions circled back to Magaña Arevalo's truck, with Edwards inquiring whether the truck had moved or been loaned out to anybody. According to Magaña Arevalo, the truck had not moved, he had not loaned it, and his girlfriend had the keys. Magaña Arevalo said he sometimes lends the truck to friends but he did not think anybody had touched it recently. Magaña Arevalo explained, "[I]t actually doesn't start, because it has a bad battery right now." In response to Edwards's questions, Magaña Arevalo agreed that the wheels of truck are "kinda shiny."

Edwards then informed Magaña Arevalo that the police had video of a truck similar to his. Magaña Arevalo responded that he had his girlfriend's truck, a blue Ford that was at her mom's house. "I-I- we have, like, multiple trucks and stuff, you know what I mean?" Edwards continued, stating that they had video of a very serious crime that led to the belief that Magaña Arevalo's vehicle was involved. Edwards told Magaña Arevalo, "what we're tryin' to do is open a door for you to—

8

to talk to us about it and give us some information." Magaña Arevalo said, "I'm good with that, you know?"

Magaña Arevalo and Edwards again discussed his truck—who had access to it and when it had been driven. Jose's name came up again in the context of the truck, but Magaña Arevalo said he had not seen or talked to Jose for a few days. Magaña Arevalo mentioned the shooting at his uncle's house again, saying he messaged Jose to make sure his mom was okay. Magaña Arevalo said he and Jose have "issues," he did not want Jose coming to his house, he did not know how to get a hold of Jose, and he did not know any of Jose's friends.

Edwards also returned to questions about how Magaña Arevalo knew Hobbs. Magaña Arevalo explained, "I've known him, um, because his—his, uh cousin, (Tyrell) is the—one of the people that were involved with the shooting of – at my house and stuff." Magaña Arevalo elaborated that he had learned Hobbs's name when "a[n] officer actually brought him up, too, when I was talkin' to them about the shooting at my house. 'Cause they shot—when my baby mama was outside the house." Edwards finished the interrogation by taking a buccal swab for DNA testing pursuant to a search warrant and asking Magaña Arevalo if there was anything he thought the detectives needed to know. Magaña Arevalo said no, and the interview concluded after 21 minutes.

Shortly after the initial interview, the detectives wanted to clarify information gathered by other investigators and conducted a second interview with Magaña Arevalo in the truck in the QFC parking lot. Again, the detectives did not inform

Magaña Arevalo of his <u>Miranda</u> rights. Detective Edwards asked Magaña Arevalo about a recent encounter at a Subway restaurant between Magaña Arevalo and Hobbs. Magaña Arevalo said Hobbs was with another man, Elijah Chambers, and both Hobbs and Chambers "were being cool with me. I told them . . . 'I don't have no problem with you guys. I'm on my—I'm always with my family. You guys see I'm always with my family.' " Magaña Arevalo explained he does not shoot at people's families, he does not like guns or own guns. Initially, Magaña Arevalo told Edwards that Hobbs said he keeps his "gun tucked," and only uses it when he needs it. Magaña Arevalo also stated that Hobbs denied participating in the shooting at Magaña Arevalo's uncle's house. After a few more questions from the detectives, Magaña Arevalo said that Hobbs was "kind of threatening my life or something. He was like threatening me and stuff." Magaña Arevalo elaborated, "Like he was threatening me saying that he has his gun tucked and I was just like, 'Okay. Good for you.' " This interview lasted four minutes. Edwards took Magaña Arevalo back to the apartment after the execution of the search warrant was completed.

Edwards had additional follow-up questions, so he arranged a meeting at Magaña Arevalo's apartment a few days later, on December 3. Edwards and another detective were invited into the apartment and sat on the couch in the living room. Magaña Arevalo's girlfriend and uncle were present. Magaña Arevalo agreed to speak with detectives, and the conversation was recorded. The

detectives did not inform Magaña Arevalo about his <u>Miranda</u> rights prior to the third interview.

During the third interview, Edwards asked additional questions about the parties involved in the shooting at Magaña Arevalo's uncle's house. Magaña Arevalo told Edwards, "[S]upposedly Jason Hobbs was like laughing about it saying that he was involved, saying that he was one of the shooters that shot at my house and all that, and that he was just like bragging." Magaña Arevalo further stated, "[T]hey're mentioning my house and them shooting up my house and obviously they had something to do with it." Magaña Arevalo also explained that the shooting was related to Jose. Magaña Arevalo said he was not involved and had no problems with Hobbs. In fact, Magaña Arevalo said he told Hobbs, "I had no problems with him. I told him that I don't have no problems."

Edwards and Magaña Arevalo discussed Jose and the possible source of the "beef" between Jose and Hobbs. Magaña Arevalo asserted that he had heard that people were assuming Jose was responsible for the shooting. Edwards said the police were looking for Jose and wanted to talk with him, and Magaña Arevalo said he had not had contact with Jose but had been asking around to find him.

Edwards raised the issue of Magaña Arevalo's cell phone, and Magaña Arevalo reiterated that he had lost his phone. Edwards also questioned Magaña Arevalo further about his claim that he did not own any guns. Magaña Arevalo confirmed that neither he nor his girlfriend owned a gun. At that point, Edwards showed Magaña Arevalo a photograph of a Heckler & Koch (HK) gun case the

police found in the apartment while executing the search warrant. Magaña Arevalo explained that he had found the gun case in his Honda after the vehicle had been stolen. When his vehicle was recovered, "they just left a bunch of stuff in my trunk of my car and stuff." Edwards asked if Magaña Arevalo kept any other items found in his recovered vehicle, but Magaña Arevalo said he held on only to the gun case to possibly store his BB guns.

Edwards revealed that police had located an HK gun magazine at the crime scene. He asked Magaña Arevalo if his DNA was going to be on that magazine. In response, Magaña Arevalo explained, "[W]hen I found the gun case there was actually a magazine in there but I got rid of that magazine. I sold it to someone else. I didn't sell it. I just gave it away to someone." Magaña Arevalo said that he had given the magazine to a friend of Jose's over eight months prior and Jose had also touched the gun magazine as part of that transaction.

Edwards asked several additional questions about the gun magazine. He also asked Magaña Arevalo about his Chevrolet Tahoe and when it had been driven and who might have had access to the vehicle. The recorded interview concluded after 31 minutes.

At a CrR 3.5 hearing to determine the admissibility of Magaña Arevalo's three statements to the police, the trial court heard testimony from Edwards and Magaña Arevalo. The court concluded the three statements (two from December 1, one from December 3) were admissible because each was voluntary, did not result from custodial interrogation, and Miranda warnings were not required prior

to any of the statements. Subsequently, at trial, the State played portions of Magaña Arevalo's recorded statements for the jury during its case in chief,[5] and Magaña Arevalo was questioned about the statements both on direct and cross-examination. The State also used excerpts of the statements during its closing argument.

### A.    Custodial Interrogation

Magaña Arevalo claims the trial court's failure to exclude his statements obtained without Miranda warnings violated his constitutional protections against self-incrimination. The federal and Washington State constitutions guarantee the right against self-incrimination. U.S. CONST. amends. V, VI, XIV; WASH. CONST. art. I, § 9. Miranda warnings were developed to protect the right against self-incrimination "while in the coercive environment of police custody." State v. Heritage, 152 Wn.2d 210, 214, 95 P.3d 345 (2004). To ensure this protection, Miranda warnings must be given before custodial interrogation of a criminal suspect by an agent of the state. Heritage, 152 Wn.2d at 214.

The Washington Supreme Court has described the reasons for these protections as follows:

> The Court [in Miranda] explained that in-custody interrogations largely take place in an incommunicado police-dominated atmosphere where there is potential for physical brutality and psychological ploys aimed at inducing suspects to confess. Id. at 445-48, 86 S. Ct. 1602. Even in the absence of explicit coercion, when the government significantly curtails an individual's freedom of action, the individual may be effectively compelled to speak

---

[5] Portions of those interviews were redacted pursuant to Magaña Arevalo's motion in limine under ER 701.

13

> when, in a freer setting, they would exercise their right to remain
> silent. Id. at 455-56, 86 S. Ct. 1602.

State v. Escalante, 195 Wn.2d 526, 532, 461 P.3d 1183 (2020). Thus, without a Miranda warning, incriminating statements made during custodial interrogation may not be used as evidence against the person in a criminal trial.[6] Escalante, 195 Wn.2d at 532.

In the context of Miranda, "custodial" refers to "whether a defendant's movement was restricted at the time of questioning." State v. Lorenz, 152 Wn.2d 22, 36, 93 P.3d 133 (2004). The objective measure of custody is whether a reasonable person would believe they are in custody "to a degree associated with formal arrest." Id. at 36-37. The court considers the totality of the circumstances including the "nature of the surroundings, the extent of police control over the surroundings, the degree of physical restraint placed on the suspect, and the duration and character of the questioning." Escalante, 195 Wn.2d at 534.[7]

We review factual findings after a CrR 3.5 hearing for whether they are supported by substantial evidence in the record. State v. Broadaway, 133 Wn.2d

---

[6] As an exception to this rule, "[a] defendant's statements are admissible as impeachment evidence, even when such statements are obtained in violation of Miranda safeguards, so long as the statements are voluntarily made." State v. Borsheim, 140 Wn. App. 357, 371, 165 P.3d 417 (2007); see also Harris v. New York, 401 U.S. 222, 225, 91 S. Ct. 643, 28 L. Ed. 2d 1 (1971); Oregon v. Hass, 420 U.S. 714, 723, 95 S. Ct. 1215, 43 L. Ed. 2d 570 (1975); Escalante, 195 Wn.2d at 532 n.3.

[7] We note that our Supreme Court has held that a person's race and ethnicity are relevant to determining whether a person has been seized. State v. Sum, 199 Wn.2d 627, 643, 511 P.3d 92 (2022). The court clarified the seizure inquiry, stating that when determining an objective observer's view of "the totality of circumstances," "an objective observer is aware that implicit, institutional, and unconscious biases, in addition to purposeful discrimination, have resulted in disproportionate police contacts, investigative seizures, and uses of force against BIPOC in Washington." Id. at 653. While the seizure inquiry is different from the custodial interrogation inquiry, they both involve similar assessments of the totality of circumstances.

118, 131, 942 P.2d 363 (1997). "Substantial evidence exists where there is a sufficient quantity of evidence in the record to persuade a fair-minded, rational person of the truth of the finding." State v. Hill, 123 Wn.2d 641, 644, 870 P.2d 313 (1994). We then determine whether the supported findings and unchallenged findings support the court's conclusions of law. State v. Coleman, 6 Wn. App. 2d 507, 516, 431 P.3d 514 (2018). Thus, an appellate court reviews de novo a trial court's conclusion that a suspect was not in custody. Lorenz, 152 Wn.2d at 36.

In its order after the CrR 3.5 hearing, the court distinguished "Findings as to Undisputed Facts," "Disputed Facts," and "Findings/Conclusions as to Disputed Facts." The court identified as "disputed" only three facts: Magaña Arevalo's allegations that the SWAT team threatened to use deadly force if he did not come out of his residence; that the weather "was not very cold"; and that he felt "pressured" to speak to Edwards and Renggli.

To the extent Magaña Arevalo challenges findings regarding credibility, we do not address them, as we defer to the fact finder on issues of conflicting testimony and witness credibility. See, e.g., State v. Truong, 168 Wn. App. 529, 534, 277 P.3d 74 (2012). This includes the court's finding that Magaña Arevalo's testimony about the disputed facts "was not credible and those allegations are not true."[8]

---

[8] Magaña Arevalo also challenged the finding that "the testimony of Det. Edwards was credible."

As to the other findings that Magaña Arevalo challenges, they were supported by substantial evidence. The finding that "there were no armed officers immediately outside the truck doors," is supported by Magaña Arevalo's own testimony that he did not remember seeing officers outside of the car, as well as Edwards's testimony that there was not anyone standing outside the truck door or assigned to guard the truck. The finding that the officers' interaction was "cordial and not coercive or aggressive" is supported by Magaña Arevalo's testimony that his conversation with Edwards was "casual" and his own demeanor was "pretty free and open," as well as the audio recordings of the interview, in which both Edwards's and Magaña Arevalo's voices are calm and not raised.

Further, the findings that the officers did not do anything to threaten, intimidate or coerce Magaña Arevalo to talk and that he was free to leave and not placed under arrest were supported by substantial evidence. In the recordings, Edwards tells Magaña Arevalo, "You're not under arrest," and "You can leave at any time," and Edwards testified to the same at the hearing. Magaña Arevalo also agreed that neither detective made any threats, had their weapons in sight, or offered anything in exchange for his statement. Both Edwards and Magaña Arevalo testified that Magaña Arevalo was not arrested on December 1.

Magaña Arevalo also challenges the court's conclusions that his statements were not custodial. He argues that his statements were custodial because "after being jolted awake and forced out of his home early in the morning by a police officer on a loudspeaker, confronted by an overwhelming armed police presence

16

outside his apartment, restrained in zip-ties and forcibly driven to the staging area in a patrol car," any reasonable person in his position would not have felt free to leave or decline Edwards's request to speak with him. Indeed, when the police executed the warrant, at least 25 officers, including a SWAT team, gathered early in the morning outside Magaña Arevalo's apartment. They used a megaphone to awaken him and instruct him to come out, or else the police would come into the residence. Magaña Arevalo came out of his residence to face massed officers with weapons and what he called "the SWAT truck," an armored vehicle emblazoned with "Police and lights." An armed uniformed officer used zip-ties to secure his hands behind his back while his girlfriend and son were escorted away from him. After waiting next to the SWAT truck for a few minutes, Magaña Arevalo, still in restraints, was placed in the back of a police car. After a few more minutes, he was driven by a uniformed officer to a nearby QFC parking lot, where he was told detectives were waiting to speak with him. At the QFC parking lot, he saw approximately five police cars, two or three police vans, and five law enforcement officers.

At this point, a reasonable person in Magaña Arevalo's position, as a young man of color being sought by and surrounded by a large law enforcement presence, physically restrained by zip-ties, would find the situation overwhelming and intimidating, would feel his movement was restricted, and would believe he was in custody to a degree associated with formal arrest. Given the show of force

and the circumstances leading up to the interrogation, the prudent course of action would have been to give a Miranda warning prior to any questioning.

The State contends, however, that no Miranda warning was necessary because once Magaña Arevalo arrived at the QFC lot, Edwards immediately removed the zip-ties, told Magaña Arevalo he was not under arrest and asked if he was willing to speak with him, and Magaña Arevalo agreed. Edwards gave Magaña Arevalo the choice of remaining in the QFC parking lot or going to the police station. At Magaña Arevalo's choice, they stayed at the parking lot. Magaña Arevalo agreed to the conversation being recorded.

The State also argues that the presence of multiple officers did not necessarily convert the investigative detention into custody requiring Miranda warnings. Even if a person is seized within the meaning of the Fourth Amendment, they are not necessarily in custody for Miranda purposes. Escalante, 195 Wn.2d at 533 (citing Berkemer v. McCarty, 468 U.S. 420, 442, 104 S. Ct. 3138, 82 L. Ed. 2d 317 (1984)). See also State v. Heritage, 152 Wn.2d 210, 218, 95 P.3d 345 (2004) ("Washington courts agree that a routine Terry[9] stop is not custodial for the purposes of Miranda."). The State points to State v. Marcum, in which the police had a reasonable suspicion that the defendant possessed cannabis based on information from an informant. 149 Wn. App. 894, 901-03, 205 P.3d 969 (2009). The police stopped Marcum for the purpose of investigating whether he was engaged in dealing drugs. Id. at 910. The fact that there were numerous police

_____

[9] Terry v. Ohio, 392 U.S. 1, 5, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968).

18

vehicles surrounding him in a parking lot did not convert the detention into a custodial arrest. Id. at 909-10. The court reasoned that while Marcum was not free to leave, in an investigatory detention, the officer may ask questions "to confirm or dispel the officer's suspicions without rendering the suspect 'in custody' for the purposes of Miranda," and that is what occurred. Id. (quoting Heritage, 152 Wn.2d at 218).

But even if a seizure is lawful under the Fourth Amendment, the Miranda custody inquiry is different; we must examine the totality of the circumstances to determine whether a reasonable person in that position would feel restrained to the degree associated with formal arrest. Escalante, 195 Wn.2d at 536. For example, in Escalante, the defendant was interrogated at a border crossing between Canada and Washington State. Id. at 529-30. The court noted that border searches and seizures are a longstanding exception to the warrant requirement under the Fourth Amendment. Id. at 535. After answering questions at the primary inspection area, Escalante was routed to a secondary inspection area, which the court stated "would cause a reasonable person to feel subject to an increased level of suspicion." Id. at 540. Then, at the secondary inspection area, he was separated from his belongings, his documents were confiscated, and he was subjected to a pat-down search and detained for five hours in a locked lobby that was not accessible to the public or other travelers. Id. Agents controlled entry to and exit from the lobby, and Escalante was not allowed to leave, use the bathroom, or access water. Id. Further, he was detained for five hours. Id. For the inquiry of

whether a person is in custody, relevant circumstances include "the extent of police control over the surroundings." Escalante, 195 Wn.2d at 534. This makes sense, as the "concern of Miranda" was an "incommunicado police-dominated environment," id. at 541, and whether the individual was "in an environment that 'present[s] a serious danger of coercion." Id. at 536 (quoting Howes v. Fields, 565 U.S. 499, 508-09, 132 S. Ct. 1181, 182 L. Ed. 2d 17 (2012)).

As discussed above, here, there is no question that the initial encounter when the police arrived at Magaña Arevalo's home created a "police-dominated environment." Unlike in Marcum, where the police placed Marcum in investigatory detention and posed questions accordingly, here, the police were executing a search warrant. The court's findings in this case included that the law enforcement staging area at the QFC lot was public and had customers present in and around the store, but then later, after Magaña Arevalo was brought there, that there were "several LE officers/units around the staging area who had been involved in the service of the warrant." Magaña also recalled seeing five police cars, two or three police vans, and five law enforcement officers in the same parking lot. After he was awakened at 6:00 a.m. and restrained in zip-ties, not until approximately 6:44 a.m. did Edwards remove the zip-ties. The weather was "very cold" and, after he agreed to speak with officers, Magaña Arevalo's options were to stay in the truck or to go to the police station.

This was not an investigatory detention like in Marcum, in which the police stopped Marcum because they had a reasonable suspicion he possessed

cannabis and asked him questions "to confirm or dispel the officer's suspicions." 149 Wn. App. at 910. Rather, Magaña Arevalo was in the QFC parking lot after being restrained for nearly 45 minutes and transported from his home in a patrol car. Though his wrist restraints were removed, the truck's doors were not locked and Edwards and Renggli did not display their weapons, Magaña Arevalo had been physically in an environment controlled by the police for over 45 minutes. After he entered the truck, he was effectively no longer in public view, and there were still multiple officers and law enforcement vehicles in the parking lot. He remained separated from his family. Though Magaña Arevalo himself testified the conversation was "casual," the defendant's subjective view is not determinative of the view of an objective reasonable person. Considering the totality of circumstances, a reasonable person in Magaña Arevalo's position would feel their freedom was nevertheless curtailed to the degree associated with formal arrest.

Even if Magaña Arevalo's statements on December 1 were made during a custodial interrogation, the State argues that to the extent they were voluntary, they are admissible under the impeachment exception even if they were obtained in violation of Miranda safeguards. Therefore, we must examine whether Magaña Arevalo's December 1 statements were voluntary.[10] However, the State used Magaña's statements not only for impeachment purposes, but also as substantive

---

[10] We need not address whether the December 3 statements were voluntary, as Magaña Arevalo does not contest them on that basis; rather, he argues that they were inadmissible as fruit of the poisonous tree.

evidence of motive,[11] so to the extent his statements were also used as substantive evidence, we must determine whether this constituted harmless error.

B.      Voluntariness

Admission of an involuntary confession at trial violates both article I, section 9 of the Washington State Constitution and the Fifth Amendment to the United States Constitution. State v. Unga, 165 Wn.2d 95, 100, 196 P.3d 645 (2008). To determine whether a statement was coerced by an express or implied promise or the exertion of improper influence, the trial court must consider the totality of the circumstances surrounding the interrogation. Id. at 101. Coercive police activity is necessary to find that a statement was not voluntary. Id. "[B]oth the conduct of law enforcement officers in exerting pressure on the defendant to confess and the defendant's ability to resist the pressure are important." Id.

The trial court's findings of fact after the CrR 3.5 hearing included the finding that Magaña Arevalo "spoke to the LE [law enforcement] officers voluntarily and did not manifest or verbalize any hesitation or unwillingness to talk to them." Further, the court found that "[t]he detectives' interaction with Magaña-Arevalo was cordial and not coercive or aggressive," and the detectives did not threaten, intimidate, coerce, or incentivize Magaña Arevalo to talk or give a statement. The

---

[11] During oral argument, the State acknowledged that Magaña Arevalo's statements were not admitted solely for impeachment purposes. Wash. Court of Appeals oral argument, State v. Magaña Arevalo, No.84259-5-I (Nov. 7, 2023) at 14 min., 25 sec., to 14 min, 30 sec., video recording by TVW, Washington State's Public Affairs Network, https://tvw.org/video/division-1-court-of-appeals-2023111127/?eventID=2023111127.

court further found that "Magaña-Arevalo was not pressured or coerced to speak to Detectives Edwards and Renggli."

Here, the trial court's findings as to whether Magaña Arevalo's statements were made voluntarily are supported by substantial evidence presented at the CrR 3.5 hearing. Magaña Arevalo testified that he and Edwards had a "casual conversation," with the detective "casually questioning" him and making it clear that "he was just trying to get to the bottom of what had occurred with respect to Mr. Hobbs's homicide." The in-car video of Edwards's first contact with Magaña Arevalo and audio recording of the interviews demonstrate calm and non-aggressive verbal exchanges. Edwards immediately removed Magaña Arevalo's restraints, offered Magaña Arevalo the choice of speaking at the station or the truck, and honored his preference to remain at the staging area. Magaña Arevalo acknowledged that the conversation was "pretty free and open" and he was willing to talk to the detectives. He also testified that the detectives did not make threats against him or offer him anything in exchange for his statement.

These findings of fact support the court's conclusion that Detectives Edwards and Renggli did not engage in coercive police activity. In addition, the initial show of force at the apartment was undoubtedly intimidating, but Magaña Arevalo acknowledged that the police presence in the QFC parking lot was significantly less than outside the apartment. And the trial court expressly found that Magaña Arevalo's statements that he felt "pressured" to speak to the Detectives were not credible. An appellate court does not disturb a trial court's

credibility determination. State v. Radcliffe, 139 Wn. App. 214, 220, 159 P.3d 486 (2007). As a result, the trial court's findings of fact as to the character of the questioning support the conclusion that Magaña Arevalo's statements were voluntary.

### C.    Harmless Error

Magaña Arevalo argues that the erroneous admission of custodial statements requires reversal. "To find an error affecting a constitutional right harmless, we must find that the error was harmless beyond a reasonable doubt; we must look only at the untainted evidence and find it is overwhelming enough to necessarily lead to a guilty verdict." State v. France, 121 Wn. App. 394, 400-01, 88 P.3d 1003 (2004). See also In re Pers. Restraint of Cross, 180 Wn.2d 664, 688, 327 P.3d 660 (2014) ("Constitutional errors are harmless if the untainted evidence is so overwhelming that it leads to the same outcome."), abrogated on other grounds by State v. Gregory, 192 Wn.2d 1, 427 P.3d 621 (2018). The court must consider the entire record for a harmless error determination. State v. Romero-Ochoa, 193 Wn.2d 341, 364, 440 P.3d 994 (2019).

### 1. Use of Statements for Impeachment

As discussed above, because Magaña Arevalo's statements were voluntary, they were admissible for impeachment purposes even if they were made in custody without Miranda warnings. The State used Magaña Arevalo's December statements to impeach his testimony and to point out inconsistencies in his statements with other evidence during closing argument.

For instance, Magaña Arevalo testified at trial that on the morning of December 1, when he was awakened by the police, he did not notice anything unusual about where his Chevrolet Tahoe was parked. He later testified he did not know if people had used his truck. On cross-examination, he acknowledged that on December 3, he told Edwards, "I think it's obviously someone that knows me took my car," and, "I feel like this is all trying to be a setup on me." He further testified that when he told the detective about his car being stolen, he was talking about his Honda, not the Chevrolet Tahoe. But he then admitted that the context of the December 3 statement was a conversation about the Chevrolet Tahoe and his suspected involvement in the homicide.

Further, the State highlighted the inconsistency between Magaña Arevalo's description of his whereabouts on the evening of the homicide in his December 1 statement and other evidence. The video from the Nike store showed that Magaña Arevalo and his family left the store at around 5:30 p.m. on November 30. At closing, the State argued, "[I]f you believe Mr. Magaña, back on December 1st, 2018, he says that they got home around 7:00 or 8:00 p.m. after leaving the Factoria Mall." The State then played this excerpt from the December 1 interview:

DETECTIVE EDWARDS: And so what time did you get back to your house?

MR. MAGAÑA AREVALO: I was out until like 7:00 or 8:00 is when I got home with my –

DETECTIVE EDWARDS: With the family.

MR. MAGAÑA AREVALO: Yeah.

Also, on cross-examination, the State referenced the December 1 and December 3 interviews to elicit Magaña Arevalo's admission that he had lied about whether he had a phone on the evening of November 30:

Q. Okay. So you had a phone on November 30, 2018, right?

A. Yeah, I did.

Q. Okay. And that's completely contrary to what you told Detective Edwards about the fact you lost your phone and didn't have one, right?

A. Yeah.

Q. Okay. So you were not being truthful with Detective Edwards.

A. I didn't want them to have my phone.

Q. So you lied to him because you didn't want him to have your phone.

A. Yeah.

Q. And in fact we know from the evidence in this case that you were actually using a cell phone on November 30, 2018, right?

A. Yeah.

Q. Okay. And you recall that the jury's seen the surveillance video from the Nike store, right?

A. Yeah.

Q. And in that phone -- excuse me -- in that video, as soon as you walk in you're on your phone, right?

A. Yes.

Q. Okay. And you're talking on your phone for quite a while as you and Julissa are inside the store shopping, correct?

A. Yeah.

Q. Okay. And were you using your phone at any point in Subway?

A. I don't remember. I don't think so.

Q. Okay. And you didn't lie to Detective Edwards about not having a phone around the time of the murder just once, right?

A. Well, he asked me about it once.

Q. Well, he also asked you about it on December 3rd when he came back to the house, right?

A. Yeah.

Q. Right. And so same question and you gave him the same answer, right?

A. Yeah.

Q. And you lie to Detective Edwards again.

A. I didn't want them to have my phone or my number. It was, you know, police officers. Who would want a police officer to have their phone, you know?

Q. Okay. So you lied.

A. I guess I did.

Q. Okay. You lied twice.

A. I remember lying once. I don't remember lying a second time.

Q. Well, you just told us, sir, that you told Detective Edwards on December 1st you lost your phone, you didn't have one. Then he followed up with you on December 3rd and you told him the same thing, didn't you?

A. Yeah.

Q. Okay. So those were two separate lies.

A. Yeah.

Q. On two separate days.

A: Yeah. . . .

In closing, the State pointed out this admission and played excerpts from the

December 1 and December 3 statements:

[STATE]: And this is a still image from state's 53 [the Nike store video] that we see on screen here. And as you can see that's the defendant there in the gray and black jacket with Julissa and his son Julian. And you can see the defendant is clearly on his cell phone while shopping; the same phone that he denied having later on December 1st. And you'll recall that he actually said, as you're about to hear in this next clip, that he didn't have a phone at all at that time.

(Exhibit played in open court.)

DETECTIVE EDWARDS: Could I get your phone number?

MR. MAGAÑA AREVALO: I actually don't have a phone number right now.

DETECTIVE EDWARDS: Do you have a phone?

MR. MAGAÑA AREVALO: No, I use my girlfriend's phone. Her phone is (425) [xxx-xxxx].

DETECTIVE EDWARDS: [xxx-xxxx].

MR. MAGAÑA AREVALO: Yeah.

DETECTIVE EDWARDS: So you don't have an actual phone?

MR. MAGAÑA AREVALO: I recently lost my phone and I can't find it so I'm going -- I have to go get another one.
. . . .

DETECTIVE EDWARDS: And you said -- you told us on Saturday morning that you don't have a phone, right?

MR. MAGAÑA AREVALO: Yeah, I don't have a phone. I actually lost it and stuff, and I couldn't find it for like three days.

DETECTIVE EDWARDS: Yeah, when did you lose it?

MR. MAGAÑA AREVALO: I lost it like maybe on Thursday, or like Wednesday.

DETECTIVE EDWARDS: Okay.

(End of audio from exhibit.)

[STATE]: Now by this point you've heard the defendant testify in court and admit unequivocally that he lied to police about not having a phone on the day of the murder. He told you he lied not once but twice, right; once in the December 1st interview when the topic came up and again in the December 3rd interview when he was questioned about the same thing. Same lie two different times.

The State also used the December 1 statement to impeach Magaña Arevalo regarding whether he contacted his brother after being asked by Hobbs at Subway to do so. Magaña Arevalo testified that he "[could]n't remember if I did try to get ahold of him, but – I don't know if I did or not." On cross-examination, the State asked about his December 1 statement when he said he did not talk with his brother:

[STATE]: And your answer was, "No, I didn't. I didn't talk to him at all." Right?

[MAGAÑA AREVALO]: Yeah, I don't remember talking to him.

[STATE]: Okay. But in fact you did talk to him, right?

[MAGAÑA AREVALO]: I'm not sure.

[STATE]: Okay. Well let's take a look at some of the Facebook exhibits in this case.

The State then showed Magaña Arevalo an exchange of messages on Facebook with Megan Bradshaw from the evening of November 30 around 8 or 9 p.m.[12] On cross-examination, Magaña Arevalo admitted that he had spoken with Jose on the day that Hobbs was killed and that what he had told detectives on December 1 was not true.[13]

_____

[12] These messages had been authenticated by a representative for Meta/Facebook, who had testified and read the exchange into the record:

> The second message author Megan Bradshaw. Body reads, "Cristian, I know you met up Baby J."[ ] I think that's supposed to say earlier but it's spelled E-S-R-L-I-E-R.
>     . . . .
> First message on page 833. Author is Megan Bradshaw. Body is, "What happened to him, [expletive]?"
>         Second message. Author, Allen TGM.[ ] Body, "WTF, no, I didn't. I've been with my family all day today."
>         Third message. Author, Megan Bradshaw. Body, "So what's up?"
>         Fourth message. Author, Allen TGM. Body, "F no I was with my girl and my son all day. Those foos saw me for a sec but then I left to Bellevue."
>         Fifth message. Author, Allen TGM. Body reads, "I don't have time to be meeting people."
>         . . . .
>         Author Allen TGM. Body reads, "You know I got a family and I don't be doing no stupid," expletive.
>         . . . .
>         Next message. Author, Megan Bradshaw. Body, "Talk to Jose."
>         Next message. Author, Allen TGM. Body, "You talk to him. I'm not a part of this" expletive.
>         Next message. Author, Allen TGM. Body, "I haven't even met up with Jose today either. I just told him I saw Baby J and I even squashed the beef with him."

"Baby J" was a nickname by which Hobbs was known. "Allen TGM" was one of Magaña Arevalo's Facebook names.

[13] The State's exchange with Magaña Arevalo was as follows:

> Q. Okay. So based on what you told Ms. Bradshaw in that Facebook conversation, you did in fact speak with Jose on the day that Jason was killed, right?
>
> A. Yeah, I did.
>
> Q. Okay. And so what you told the detectives about not having any contact with your brother that day, that was not true.

Then, during its closing argument, the State played two excerpts from the December 1 interview in which Magaña Arevalo claimed not to have contacted Jose after meeting with Hobbs at the Subway:

DETECTIVE EDWARDS: And did you talk to Jose after that?

MR. MAGAÑA AREVALO: No, I didn't really -- I didn't talk to him.

DETECTIVE EDWARDS: No, you started to say, "No, I didn't really."

MR. MAGAÑA AREVALO: No, I didn't. I didn't talk to him at all.
. . . .

DETECTIVE RENGGLI: Just to clarify, so right now it's Saturday morning.

MR. MAGAÑA AREVALO: Yeah, yeah.

DETECTIVE RENGGLI: Okay. So we're talking Friday. Did you talk to or see Jose on Friday?

MR. MAGAÑA AREVALO: No, I didn't.

The State argued that these inconsistencies showed Magaña Arevalo had not been truthful in the interviews:

---

A. Yeah, I talked to him maybe once that day and that was because Jason and Elijah wanted me to contact him to let him know they were trying to look for him.

Q. Well, that's not what you told the detectives, is it?

A. No, it's not.

Q. And so in fact what you represented to the detectives was not true.

A. Yes, I guess it was.

Q. Yes, it was true, or yes, it was not true?

A. It wasn't true.

> [STATE]: And in both clips you can hear Mr. Magaña say categorically that he did not have any contact with Jose on the day of the murder. And that simply isn't true based on what he's telling Ms. Bradshaw in these Facebook messages on the evening of November 30, about three hours after the murder.
>
> It's not even true based on what Mr. Magaña admitted this morning which is that he did in fact have contact with his brother Jose that evening. Mr. Magaña evidently thought, based on the evidence, that the meeting with Mr. Hobbs was important enough to mention to Jose. The same brother that he's been trying to convince you through his statements to police and his testimony in court that he wanted nothing to do with.

The State also used the December 3 statements to point out inconsistencies in Magaña Arevalo's explanation of his handling of the gun magazine, on which his DNA was found. Magaña Arevalo testified that the day after he retrieved his recovered stolen car, he met with people at a park, and told them the people who taken his car had left items in it, including a gun box. He also testified that a person named Chistoso opened the gun box, saw a gun magazine, and asked if he could have it. Magaña Arevalo explained that his brother grabbed the gun box and said he was going to take the magazine and sell it to Chistoso, and that Magaña Arevalo let him take it and Jose said he would give him $20 for it later. The State cross-examined Magaña Arevalo about his December 3 statements, noting that he had stated variously that he had given away the gun magazine, that he sold it to someone named Chistoso for $20, that Jose sold it to Chistoso, and that Jose had touched the gun magazine.

In closing argument, the State played excerpts from the December 3 interview, noting the interview was the first time Magaña Arevalo mentioned

finding a gun magazine after his stolen vehicle was recovered earlier that year, after Edwards told him, "You know that DNA can be compared to the HK USP magazine that I found at the crime scene, right?" Magaña Arevalo then said when he found the gun case there was a magazine in there also, but he "sold it to -- I gave it to some dude named Chistoso." The State then continued to highlight the inconsistent stories about who gave the gun magazine to Chistoso, playing another excerpt from the December 3 interview.

The State's use of the December 1 and 3 statements as discussed above was not error because the purpose was to impeach Magaña Arevalo.

2. Use of Statements as Substantive Evidence

In addition to these efforts to impeach Magaña Arevalo, the December statements were also used as substantive evidence regarding a critical factual dispute: whether Magaña Arevalo had any motive to kill Hobbs. According to Magaña Arevalo, Hobbs's dispute was with his brother Jose, not him.

On direct, Magaña Arevalo testified that he encountered Elijah Chambers and Hobbs outside the Subway in the parking lot. He said that Hobbs was asking "where [Magaña Arevalo's] brother was at" and if he could get a hold of him because he wanted to talk to him. Magaña Arevalo further testified, "I told him that I would try because I don't really talk to my brother like that . . . ." He described the conversation as "cordial" and noted once they were done, "I shook his hand." Asked whether "[a]t any point did you ever feel intimidated or threatened by Mr. Hobbs or Mr. Chambers on that occasion," he answered, "No." However, he

33

acknowledged that in the December 1 interview, he told detectives he felt intimidated by Hobbs because at one point, Hobbs mentioned "that he keeps his gun tucked in his car."

The State cross-examined Magaña Arevalo about inconsistent statements regarding whether he had a "beef" with Hobbs:

> Q. . . . . And you were saying earlier, in fact you've repeated throughout your testimony, that you didn't have any sort of animosity with Jason, you didn't have a beef with him, right?
>
> A. I didn't.
>
> Q. Okay. But nonetheless in this conversation with Ms. Bradshaw in that message at the top there, you're telling her that you had relayed to Jose that you had squashed the beef with him, right, meaning the beef with Baby J?
>
> A. It wasn't my beef. It was Jose's beef with him. So I was trying to let him know that I -- I was trying to settle whatever they had going on. It was not involving me. That's what I meant by that.

At closing, the State used Magaña Arevalo's interview statements to argue that Magaña Arevalo "offered either incomplete or inconsistent descriptions to police about the encounter at Subway," as well as that there was "an abundance" of evidence that he harbored "a fair degree of animosity towards Mr. Hobbs." The State used excerpts from the December interviews to support this argument, playing an excerpt from the December 1 interview[14]:

---

[14] To further establish that Magaña Arevalo had a direct dispute with Hobbs, the State also played an excerpt from the December 3 interview:

> MR. MAGAÑA AREVALO: I have friends that -- that spoke to me about the whole incident. And supposedly Jason Hobbs was like laughing about it saying that he

34

DETECTIVE RENGGLI: So this Jason guy –

MR. MAGAÑA AREVALO: Uh-huh.

DETECTIVE RENGGLI: -- you've known him?

MR. MAGAÑA AREVALO: Well, yeah, I've known him because it's -- his cousin Terrell is one of the people that were involved with the shooting at my house and stuff.

DETECTIVE RENGGLI: Oh, okay.

MR. MAGAÑA AREVALO: And that's how I found out. I know the name. And officer actually brought him up, too, when I was talking to them about the shooting at my house. Because they shot when my baby mama was outside of the house –

DETECTIVE EDWARDS: Yeah.

MR. MAGAÑA AREVALO: -- they shot at my baby mama. They shot at my kid. He was inside the car. And I was -- at the moment I was helping someone with a job and stuff.
        And she calls me telling me about the shooting and stuff –

DETECTIVE EDWARDS: Okay.

MR. MAGAÑA AREVALO: -- so I went over there and then they had already names. They had like a bunch of names about different people and stuff.

The State noted that in the initial December 1 statement, knowing Hobbs

had been murdered and that he was being questioned in connection with his death,

---

was involved, saying that he was one of the shooters that shot at my house and all that, and that he was just like bragging –

DETECTIVE EDWARDS: Jason said that?

MR. MAGAÑA AREVALO: Yeah.

DETECTIVE EDWARDS: Okay.

MR. MAGAÑA AREVALO: Yeah, he was like bragging about that he was -- that he was one of the main ones and all that.

Magaña Arevalo "conveniently neglected to mention that he met Mr. Hobbs on the day of the killing." The State then played an excerpt from the second December 1 interview, highlighting that he described the meeting as a cordial, regular conversation:

> MR. MAGAÑA AREVALO: They parked there to -- they called me over to their car and I talked to them for a second. And as soon –
>
> DETECTIVE EDWARDS: Just cordial like?
>
> MR. MAGAÑA AREVALO: Yeah, just cordial.
>
> DETECTIVE EDWARDS: No problem.
>
> MR. MAGAÑA AREVALO: Just like, you know, just regular conversation and stuff. And then right after that I just hopped in my car. I left. And I seen that they were just going to get some food and stuff. And that's it. That's all that happened.
>
> DETECTIVE EDWARDS: Any mention about any riffs or any problem between the two of you?
>
> MR. MAGAÑA AREVALO: No, there was no mentions about nothing like that.

The State then played an excerpt from the same recording where Magaña Arevalo made a contrary suggestion that Hobbs was threatening his life:

> DETECTIVE EDWARDS: Well, how was Jason being to you?
>
> MR. MAGAÑA AREVALO: He looked like he was like, I don't know, like mad at me or something. Like he was just like trying to threaten my life or something. He was like threatening me and stuff like –
>
> DETECTIVE EDWARDS: Yeah -- go ahead.
>
> MR. MAGAÑA AREVALO: Yeah, he was threatening me saying he has his gun tucked. And I was just like, "Okay, good for you." You know what I mean? And I was like, "You see I'm with my family right now. I don't -- I don't do none of that street stuff. I'm always

with my family. My girl's pregnant. My son is – he's getting old. You know, what I mean? I don't have time to be out and about with people. You know what I mean?"

The State argued that the latter statement, that he was intimidated or fearful, was "clearly calculated" to "make him look like a potential victim rather than an aggressor."

### 3. Untainted Evidence

Because the custodial statements were used for a substantive purpose, to establish Magaña Arevalo's motive, we must look to whether untainted evidence would lead to the same conclusion as to whether Magaña Arevalo had a "beef" with Hobbs. There were multiple sources other than the December statements for such evidence. Hobbs's girlfriend, Amani Gipson, testified that Hobbs called her on the afternoon of November 30 and told her that he had run into Magaña Arevalo at Subway. He also told her that they planned to "meet up" and that the purpose of the meeting was "to get the fight over and done with, so that they wanted to fight."

Similarly, Egan-McCoy described how Hobbs was at his house on November 30 and told him that he intended to meet up with both Jose and Cristian. Hobbs told Egan-McCoy that "he was trying to settle a beef that he was tired of running from because he was about to have a baby and he didn't want to deal with it." Egan-McCoy further testified that Hobbs told him the location of the planned meet up was at Chambers's apartment, and that no guns were supposed to be involved. Egan-McCoy followed Hobbs there and parked nearby and could hear

37

Chambers and Hobbs talking, as he asked Hobbs to leave the phone on speaker phone. He waited a long time and then hung up and called Hobbs back, because he thought the amount of time that had gone by was "suspicious." Hobbs mentioned he would call one of the brothers, and Hobbs and Egan-McCoy planned to meet back at Egan-McCoy's apartment complex five minutes away.

The State also entered into evidence a series of Facebook messages between Magaña Arevalo and Megan Bradshaw, from the evening of November 30, after the homicide, in which she said she knew he had met up with Hobbs and asked what happened. He messaged her that, "I haven't even met up with Jose today either. I just told him I saw Baby J and I even squashed the beef with him."

Thus, even without the December statements, there were multiple sources of evidence of a "beef" between Magaña Arevalo and Hobbs. In addition to that evidence on the issue of motive, there was also overwhelming untainted evidence to necessarily lead to a guilty verdict.

As noted above, Magaña Arevalo testified that Hobbs had been involved in a shooting at his uncle's house while Magaña Arevalo's girlfriend and child were present. Video from Subway shows Hobbs, Chambers, and Magaña Arevalo met the afternoon of November 30. The jury heard evidence that Magaña Arevalo and his brother Jose had a "beef" with Hobbs and they all planned to meet at Chambers's apartment to settle the conflict. Egan-McCoy also testified that

Chambers had coordinated a meeting to settle the dispute, Chambers's cell phone records show numerous calls between himself and Hobbs, Magaña Arevalo, and Jose. The shooting took place right outside of Chambers's apartment.

The gun used in the shooting was never recovered. An HK gun magazine found at the scene had DNA on it consistent with that taken from Magaña Arevalo pursuant to the search warrant. During the search of Magaña Arevalo's and his girlfriend's apartment, police located an empty HK gun case in a closet. Magaña Arevalo claimed he had found the gun case in his Honda after the vehicle had been stolen and recovered. However, the police officer who recovered the Honda testified that he had searched the vehicle upon its recovery and had not seen the gun case.

Surveillance footage from Subway and the Nike store showed Magaña Arevalo wearing a two-toned jacket like the one worn by the shooter in the video of the shooting.[15] Eyewitnesses gave various descriptions of the two men involved in the altercation with Hobbs, as well as the shooter. While two witnesses testified that the shooter was African American, one witness testified the two men were "Hispanic-looking."

Evidence of the distances between Magaña Arevalo's apartment and the scene, the drive times between the locations, and his phone location data established a timeline that showed Magaña Arevalo could have been present at

---

[15] Magaña Arevalo testified that his mother had given him and Jose the same two-toned jackets in different colors for Christmas the year before. Cristian's jacket was black and gray, while Jose's was "darker color, green or blue."

Chambers's apartment complex at the time the homicide occurred. Multiple witnesses saw an SUV, specifically a Chevrolet Tahoe, in the area when Hobbs was killed. One witness testified that the SUV was blue. Surveillance video from the apartment complex captured a Chevrolet Tahoe with shiny rims at the time of the altercation. The video and witness description of the car were consistent with Magaña Arevalo's vehicle that had aftermarket rims and two white stickers on the rear bumper.

The untainted evidence—that is, without Magaña Arevalo's statements that were used as substantive evidence—was overwhelming and establishes beyond a reasonable doubt that the outcome would have been the same without Magaña Arevalo's statements. Thus, even if Magaña Arevalo's custodial statements made without Miranda warnings were erroneously admitted and used as substantive evidence, any error was harmless.

II.     Zoom Voir Dire

Magaña Arevalo contends for the first time on appeal that his jury trial rights were violated by the trial court's decision to conduct remote voir dire by Zoom. A party generally waives its right to appeal without a timely objection at trial. State v. Kalebaugh, 183 Wn.2d 578, 583, 355 P.3d 253 (2015). However, a party may raise a "manifest error affecting a constitutional right" for the first time on appeal. RAP 2.5(a)(3).

"For a claim of error to qualify as a claim of manifest error affecting a constitutional right, the defendant must identify the constitutional error and show

that it actually affected his or her rights at trial." State v. Lamar, 180 Wn.2d 576, 583, 327 P.3d 46 (2014). We do not assume the alleged error is of constitutional magnitude, but "look to the asserted claim and assess whether, if correct, it implicates a constitutional interest." State v. O'Hara, 167 Wn.2d 91, 98, 217 P.3d 756 (2009). Additionally, the defendant must show the claimed error has "practical and identifiable consequences." Lamar, 180 Wn.2d at 583.

Magaña Arevalo claims Zoom voir dire violated his "right to in-person jury selection under article I, section 21 of the Washington Constitution." Article I, section 21 states, "[t]he right of trial by jury shall remain inviolate." The purpose of this article "was to preserve inviolate the right to a trial by jury as it existed at the time of the adoption of the constitution." State v. Smith, 150 Wn.2d 135, 150-51, 75 P.3d 934 (2003). According to Magaña Arevalo, this right includes the right to in-person jury selection.

However, this court has recently held that article I, section 21 "governs under what circumstances a litigant is afforded the right to a jury trial" rather than the selection of a jury. State v. Booth, 24 Wn. App. 2d 586, 604, 521 P.3d 196 (2022), review denied, 1 Wn.3d 1006, 526 P.3d 849 (2023).[16] As a result, Magaña Arevalo's claim that conducting voir dire via Zoom violated article I, section 21, fails

---

[16] In an unpublished opinion, this court recently rejected a challenge to Zoom voir dire under article I, section 21, relying on Booth. See State v. Morris, No. 83157-7-I, slip op. at 26 (Wash. Ct. App. Jan. 22, 2024) (unpublished), https://www.courts.wa.gov/opinions/pdf/831577.pdf (citing Booth, 24 Wn. App. 2d at 604-05). While Morris is not binding on us, we find its reasoning persuasive and may properly cite and discuss it as "necessary for a reasoned decision." GR 14.1(c).

to establish an error of constitutional magnitude as required for review under RAP 2.5(a)(3).[17] We decline to consider his unpreserved claim.

III.     Request for Exceptional Sentence

Magaña Arevalo requested an exceptional downward sentence of 180 months on the count of murder in the first degree, below the standard range of 240 to 320 months in prison, based on the mitigating factor of his youth; he was 21 years old at the time of the offense. The State requested a high-end sentence of 320 months and argued that the offense carried a mandatory minimum of 240 months pursuant to RCW 9.94A.540(1)(a), so the court did not have discretion to impose a mitigated sentence. The trial court declined Magaña Arevalo's request and sentenced him to the top of the standard range for murder in the first degree, 320 months.

Under the Sentencing Reform Act (SRA), a sentence within the standard range is not appealable. RCW 9.94A.585(1). "However, this prohibition does not bar a party's right to challenge the underlying legal conclusions and determinations by which a court comes to apply a particular sentencing provision." State v. Williams, 149 Wn.2d 143, 147, 65 P.3d 1214 (2003). On appeal, Magaña Arevalo

---

[17] To the extent Magaña Arevalo challenges the use of Zoom voir dire as "unfairly and unduly" restricting his ability to select a jury on other grounds, he also does not establish a manifest error affecting a constitutional right. While he contends that "[t]he error is plain from the record on review," this oversimplifies his required showing. The fact that the court used Zoom, and the process of remote voir dire, may be obvious in the record, but Magaña Arevalo does not point to an error of constitutional dimension with a practical and identifiable consequence resulting from Zoom voir dire. Magaña Arevalo has failed to carry his burden to demonstrate a manifest error effecting a constitutional right in order for this court to reach an otherwise unpreserved error under RAP 2.5.

argues the trial court erroneously concluded it did not have discretion to depart below the mandatory sentence and refused the mitigated sentence based on youthfulness. Indeed, a trial court errs "when it operates under the 'mistaken belief that it did not have the discretion to impose a mitigated exceptional sentence for which [a defendant] may have been eligible.' " State v. McFarland, 189 Wn.2d 47, 56, 399 P.3d 1106 (2017) (quoting In re Pers. Restraint of Mulholland, 161 Wn.2d 322, 333, 166 P.3d 677 (2007)).

Here, however, the record shows that the trial court considered Magaña Arevalo's youthfulness when sentencing, as it stated, "I've considered all the factors that are appropriate under Washington statutes and case law, including Mr. Magaña's age, youthfulness, maturity." While the trial court stated, "[t]he downward exception argued for by the defense is not currently available"—which suggests that it misunderstood its discretion—the court continued, "but, even if it were available, I would not impose the downward exception requested by the defense." Thus, the trial court explicitly stated that it had considered Magaña Arevalo's age, youthfulness, and maturity, yet it still denied the mitigated sentence. "[A] trial court that has considered the facts and has concluded that there is no basis for an exceptional sentence has exercised its discretion." State v. Garcia-Martinez, 88 Wn. App. 322, 330, 944 P.2d 1104 (1997). Moreover, in sentencing Magaña Arevalo to the top of the standard range, the trial court demonstrated no inclination to exercise its discretion to impose even a lesser sentence within the standard range, much less an exceptional downward sentence. See In re Pers. Restraint of

43

<u>Meippen</u>, 193 Wn.2d 310, 317, 440 P.3d 978 (2019). We reject Magaña Arevalo's claim that the court erred by sentencing him to a standard range sentence.

IV.     Statement of Additional Grounds

Magaña Arevalo submitted a statement of additional grounds for review alleging prosecutorial misconduct, ineffective assistance of counsel, improper admission of hearsay evidence, and insufficient evidence.[18]

A.      Prosecutorial Misconduct

Magaña Arevalo contends the prosecutor committed misconduct by misrepresenting evidence in trial, specifically by arguing that his cellphone was never recovered. According to Magaña Arevalo, this statement portrayed him "as someone that withheld and got rid of evidence."

When considering a claim of prosecutorial misconduct, we determine whether the defendant was prejudiced under one of two standards of review. <u>State v. Emery</u>, 174 Wn.2d 741, 760, 278 P.3d 653 (2012). If the defendant made a timely objection at trial, he must demonstrate that any improper conduct by the State "resulted in prejudice that had a substantial likelihood of affecting the jury's verdict." <u>State v. Allen</u>, 182 Wn.2d 364, 375, 341 P.3d 268 (2015). But if a defendant does not object at trial, "the defendant is deemed to have waived any error, unless the prosecutor's misconduct was so flagrant and ill intentioned that

---

[18] Magaña Arevalo identifies an evidentiary matter as one basis for his claim of ineffective assistance of counsel, but as he fails to provide any argument or authority on that purported error, we need not analyze it.

an instruction could not have cured the resulting prejudice." Emery, 174 Wn.2d at 760-61.

Because Magaña Arevalo did not object at trial, we review the prosecutor's comment under the heightened standard, so Magaña Arevalo must show that (1) no curative instruction could have eliminated the prejudicial effect and (2) there was a substantial likelihood the misconduct resulted in prejudice that affected the jury verdict. Emery, 174 Wn.2d at 761. "Reviewing courts should focus less on whether the prosecutor's misconduct was flagrant or ill intentioned and more on whether the resulting prejudice could have been cured." Id. at 762. Prejudice is incurable when the jury's impartiality has been so undermined that a fair trial is no longer possible. Id. We consider the allegedly improper statements within the context of the entire case. State v. Thorgerson, 172 Wn.2d 438, 443, 258 P.3d 43 (2011); see also State v. Pierce, 169 Wn. App. 533, 552, 280 P.3d 1158 (2012) (we review statements "in the context of the entire argument, the issues in the case, the evidence addressed in the argument, and the instructions to the jury").

Magaña Arevalo cites to a specific statement made by the prosecutor as improper: "[T]he phone that Mr. Magaña-Arevalo, the phone the [S]tate believes he was using during the relevant time period and during the commission of the offense [ ] was never recovered by police." However, this statement was made outside the presence of the jury. Therefore, no curative instruction was necessary, and Magaña Arevalo cannot establish a substantial likelihood of prejudice that affected the jury verdict, as the jury never heard this statement by the prosecutor.

Moreover, at trial, there was evidence that the police did not recover Magaña Arevalo's phone. "[T]he State has wide latitude to argue inferences from the evidence." Pierce, 169 Wn. App. at 553. Edwards testified that T-Mobile records showed Magaña Arevalo's phone number as related to a specific phone, a Samsung J3 Prime. While the RPD recovered three different cell phones during the search of the apartment pursuant to the warrant, none of those included a Samsung J3 Prime.[19] As a result, Edwards concluded the police did not recover a phone associated with Magaña Arevalo's phone number.

Magaña Arevalo does not identify any comment by the State in the presence of the jury to which he objected or that was so flagrant and ill intentioned that an instruction could not have cured the resulting prejudice. Therefore, Magaña Arevalo's claim of prosecutorial misconduct fails.

### B.     Ineffective Assistance of Counsel

Magaña Arevalo also alleges ineffective assistance of counsel because his lawyers "failed to inform the jury that the photo of me was not picked in the photo lineup that was shown to the eyewitnesses for identification purposes." The Sixth Amendment of the United States Constitution and article I, section 22 of the Washington Constitution guarantee effective assistance of counsel. State v. Hendrickson, 129 Wn.2d 61, 77, 917 P.2d 563 (1996). To prevail on a claim of

---

[19] The jury also heard evidence that Magaña Arevalo owned a Samsung phone when he first acquired the phone number but subsequently lost the phone and purchased an iPhone as a replacement. Further, Magaña Arevalo testified that the iPhone was seized pursuant to a search warrant, but no evidence from that phone was presented at trial.

ineffective assistance of trial counsel, a defendant must prove both deficient performance and prejudice. State v. Jones, 183 Wn.2d 327, 339, 352 P.3d 776 (2015). Establishing deficient performance requires a showing that counsel's representation fell below an objective standard of reasonableness based on all the circumstances. State v. Thomas, 109 Wn.2d 222, 225-26, 743 P.2d 816 (1987).

Of the three eyewitnesses who provided physical descriptions of the suspects, two described the suspects as African American. The third witness testified that the two suspects were "Hispanic-looking" and was shown two photo montages. The witness identified the first suspect in one of the photo montages. For the second suspect, he "identified two photos in there that resembled the second suspect, but no photo directly that resembled one person." The witness testified that the two faces combined would have built a good picture of the second suspect. None of this eyewitness's testimony indicated that he chose Magaña Arevalo from either photo montage. In fact, during closing arguments, the State acknowledged that this witness was unable to pick Magaña Arevalo out of a photo montage.

Contrary to Magaña Arevalo's contention that his counsel did not inform the jury that the eyewitnesses did not pick his photo, defense counsel highlighted this fact for the jury during closing argument. Defense counsel also reminded the jury that the other two eyewitnesses described the shooter as African American. Defense counsel's performance did not fall below an objective standard of

reasonableness and was not deficient. Magaña Arevalo cannot establish a claim for ineffective assistance of counsel on this basis.

###### C.        Hearsay Statements

Magaña Arevalo claims that testimony by Hobbs's girlfriend, Amani Gipson, and his friend Phillip Egan-McCoy was inadmissible hearsay.

Hearsay is an out-of-court statement offered to prove the truth of the matter asserted. ER 801. Generally, hearsay evidence is not admissible unless subject to an exception under rule or statute. ER 802. We review whether or not a statement was hearsay de novo. State v. Hudlow, 182 Wn. App. 266, 281, 331 P.3d 90 (2014). We review whether an exception to the hearsay rule applies for abuse of discretion. State v. Carte, 27 Wn. App. 2d 861, 877, 534 P.3d 378 (2023).

###### 1.  Amani Gipson's Testimony

Rather than specify the statements from Gipson's testimony that he challenges, Magaña Arevalo contends that all of her statements were inconsistent and hearsay. In particular, he claims that Gipson made inconsistent statements to police and his lawyers prior to trial. Magaña Arevalo's challenge to Gipson's testimony appears to be concerned with this inconsistency, rather than whether it is hearsay under ER 801.

At trial, Gipson testified that Hobbs called her from Subway and explained that he had run into Magaña Arevalo and they planned to meet up later to fight. On cross-examination, Magaña Arevalo's attorney raised the issue of prior statements Gipson made to the police in which she said Chambers told her about the meeting

at Subway. During an interview with defense attorneys, Gipson said she could not remember whether Hobbs had mentioned Magaña Arevalo, but she was certain he had mentioned Jose. Magaña Arevalo's own attorneys introduced Gipson's prior statements as impeachment evidence and purposefully highlighted the inconsistency to undermine Gipson's testimony. Because evidence was introduced as impeachment rather than for the truth of the matter asserted, it was not hearsay. The court did not abuse its discretion in allowing this evidence.

> ### 2. Phillip Egan-McCoy's Testimony

Magaña Arevalo argues that Egan-McCoy's testimony included inadmissible hearsay when he said, "he was on the phone listening to the victim and an unknown individual talk about meeting with two brothers. He wasn't sure who the two brothers were."

Prior to Egan-McCoy's testimony, the parties discussed the admissibility of his statements as to what he heard on the open phone line. The court determined that proposed testimony from Egan-McCoy that he heard someone say the brothers were five to 10 minutes out was inadmissible hearsay. But the parties agreed to the admission of the statement "Hobbs told him that he was leaving and to meet at Egan-McCoy's house." Magaña Arevalo does not object to this ruling.

Egan-McCoy testified that he had Hobbs "leave his phone on speaker phone in his pocket" so Egan-McCoy "could hear what was going on." According to Egan-McCoy, after a substantial time had elapsed, he became suspicious and called Hobbs to tell him to leave the designated meeting location. Hobbs then said

he had called one of the brothers, but Egan-McCoy was not sure whether Hobbs meant Magaña Arevalo or Jose. This exchange occurred during the State's cross-examination of Egan-McCoy:

> Q. At any point did you hear Mr. Hobbs mention the brothers on the phone?
> A. Yeah, he called him.
> Q. Okay. And what do you mean by he called him?
> A. When I called him, he -- because I called him and was like too much time's gone by so he called them to see where they were. And it was just – seemed suspicious to me so I told him to get out of there and meet me at my house. And that was what we were supposed to do after that.
> Q. And when you say he called him, who are you referring to? Jason called who exactly?
> A. I'm not sure which one it was but either Cristian or Jose.

The State tried to elicit whether Chambers ever mentioned the brothers were coming, but Magaña Arevalo objected on hearsay grounds and the trial court sustained the objection. This was the extent of Egan-McCoy's testimony on this issue. The court excluded Egan-McCoy's hearsay statements and did not abuse its discretion in admitting Egan-McCoy's nonhearsay testimony.

D.    Sufficiency of the Evidence

"Evidence is sufficient to support a conviction if, after viewing the evidence in the light most favorable to the State, it allows any rational trier of fact to find all of the elements of the crime charged beyond a reasonable doubt." State v. DeVries, 149 Wn.2d 842, 849, 72 P.3d 748 (2003). A challenge to the sufficiency of the evidence admits the truth of the State's evidence and all reasonable inferences therefrom. Id. To convict on the charge of murder in the first degree the State was required to prove beyond a reasonable doubt that Magaña Arevalo

50

acted with premeditated intent to cause Hobbs's death and Hobbs died as a result of Magaña Arevalo's acts. See RCW 9A.32.030(1)(a); State v. Hummel, 196 Wn. App. 329, 354, 383 P.3d 592 (2016.)

Magaña Arevalo contends the State failed to provide sufficient evidence because the case consisted of circumstantial evidence and "[t]here was a lot of inconsistency and ambiguous evidence in the case." Magaña Arevalo's SAG then points out conflicting eyewitness testimony presented to the jury.

"An essential function of the fact finder is to discount theories which it determines unreasonable because the finder of fact is the sole and exclusive judge of the evidence, the weight to be given thereto, and the credibility of witnesses." State v. Bencivenga, 137 Wn.2d 703, 709, 974 P.2d 832 (1999). Here, the jury assessed the eyewitness and other evidence as directed by the trial court's instructions. Direct and circumstantial evidence are equally reliable in determining sufficiency of the evidence. State v. Kintz, 169 Wn.2d 537, 551, 238 P.3d 470 (2010). As discussed above in the harmless error analysis, the State presented overwhelming evidence from which the jury could conclude beyond a reasonable doubt that Magaña Arevalo committed the crime as charged. Likewise, viewed in the light most favorable to the State, based on the evidence presented at trial, any rational trier of fact would find all the elements of the crime charged proved beyond a reasonable doubt.

CONCLUSION

Magaña Arevalo's statements to police were made without <u>Miranda</u> warnings and were made during a custodial interrogation. However, because they were voluntary they were admissible as impeachment evidence. While the State also used the statements as evidence of motive, the same motive was introduced and argued with independently admissible evidence. Moreover, admission of Magaña Arevalo's statements was harmless in light of the overwhelming untainted evidence. Magaña Arevalo's challenge to voir dire conducted by Zoom videoconferencing does not raise an issue of constitutional magnitude in order to warrant review under RAP 2.5. The trial court properly exercised its discretion and considered Magaña Arevalo's youth as a mitigating factor for sentencing and did not err by imposing a standard range sentence. Finally, Magaña Arevalo's statement of additional grounds fails to raise any issues requiring reversal.

Affirmed.

_Chung, J._

WE CONCUR:

_____      _Mann, J._____